Chief Judge Fuld.
This appeal, taken upon constitutional grounds, poses the question — of first impression in this court—whether the City of New York may grant a dues “ check-off ” privilege to a union representing a majority of the municipal employees in a city-wide bargaining unit and yet deny such privilege to a minority union.[1]
In 1956, the city’s Board of Estimate adopted a resolution which granted the check-off privilege to all organizations of city employees whose members authorized the necessary payroll deductions. At that time, the city did not recognize any union as an agent for collective bargaining. Later, the city began to recognize unions as exclusive bargaining agents if they were chosen by a majority of the employees in an appropriate bargaining unit. Even then, however, the Board of Estimate resolution extending the check-off privilege to all unions alike was not changed and the city continued to give effect to its provisions.
In April, 1967, the city modified its union recognition policies by means of an executive order of the Mayor. The order provided (1) that appropriate bargaining units for municipal *604 employees were to be established on a city-wide basis or, in some circumstances, on a departmental basis and (2) that the organization chosen by a majority of the employees in each such unit was to be recognized as the exclusive bargaining representative for all employees in the unit.
The Mayor proposes to round out this policy by means of a further executive order which will give the privilege of dues check-off solely to the exclusive bargaining agents and will withdraw it from all other unions. It is the declared opinion of the Mayor and the city’s Director of Labor Relations that this plan for a restricted check-off policy, common in private industry, will afford the majority representatives a form of “ union security ” will increase their prestige and responsibility and will, in consequence, stabilize the collective bargaining process.
Local 832 (International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America) and District Council 37 (American Federation of State, County and Municipal Employees, AFL-CIO) are two unions which include persons employed by the city in nonsupervisory clerical titles. District Council 37 has been recognized by the city as the exclusive bargaining representative for such employees; under the proposed plan it will thus have the exclusive benefit of the dues check-off. Local 832, on the other hand, is a minority union and, accordingly, it will be deprived, under the proposed plan, of the check-off privilege it has enjoyed since 1956.[2] Strongly objecting, the latter organization, Local 832, has commenced this article 78 proceeding—through its president and several of its members on behalf of themselves and all others similarly situated— to require the city to continue the check-off of dues to it, and to enjoin the city from granting exclusive check-off privileges to District Council 37 or any other labor organization.[3] The *605 court at Special Term dismissed the petition and the Appellate Division unanimously affirmed the resulting order.
Under the 1963 New York City Charter (§ 8), the Mayor is authorized to “ exercise all the powers vested in the city, except as otherwise provided by law.” He is the successor to the residual powers originally possessed by the Board of Estimate under a similarly worded provision of the 1938 New York City Charter (§ 70) in effect in 1956, when that body adopted the ‘‘ non-discriminatory ” check-off policy. (See, also, New York City Charter [1963], § 1142.) The city—and, thus, the Mayor on its behalf—is empowered to enter into contracts, to regulate the terms of employment and compensation of city employees and to determine the manner of transacting the city’s business and affairs (General City Law, § 20, subds. 1, 17,19; § 23, subd. 1). The Charter also specifically authorizes the Mayor to supervise city offices and departments, fix salaries, adopt wage plans and prescribe rules governing working conditions (New York City Charter [1963], §§ 123, 124, 813, subd. 1). His executive power and discretion thus amply extend to and encompass the proposed action here under review, and no further legislative sanction is required. '
Contrary to the petitioners’ contention, the Mayor’s discretion to decide which employee organization should have checkoff privileges is not curtailed by section 93-b of the General Municipal Law. That section provides, in its subdivision 1, that a municipality is “ authorized ” to deduct dues from its employees’ pay.[4] It is unmistakably permissive, not obligatory. It does not control a municipality’s selection of the unions, if any, to which it may grant the privilege of the check-off; and it certainly does not mandate the continuance of the check-off to minority unions. The only requirements which the section *606 imposes are that, if a municipality does adopt the check-off for any union, (1) it must obtain an employee’s written consent before deducting his dues; (2) it must allow the employee to withdraw that consent at any time; and (3) the procedure must be made available only to organizations of civil service employees. These conditions are met in the Mayor’s proposed order.
That this State’s legislative policy is not antagonistic to the check-off plan embodied in the proposed executive order is manifest, also, from the terms of the Public Employees ’ Fair Employment Act (Civil Service Law, art. 14; L. 1967, ch. 392, known also as the Taylor Act). As the court noted in the course of its opinion at Special Term, that statute—which did not take effect until some months after it announced its decision — explicitly gives majority unions of public employees the right to have their members’ check-off requests honored, and is silent concerning the right to such check-off on behalf of minority unions (Civil Service Law, § 208). Although our decision in this case will have prospective effect, we need not decide whether the Taylor Act is applicable; it is sufficient to observe that, if the act does apply, it can only reinforce the decision which we reach on the basis of the pre-existing law. In short, the Mayor’s proposed policy is plainly consistent with the scheme set forth in the Taylor Act for according recognition, and a degree of union security, to bargaining agents for public employees; to mention but one provision, section 208 makes it mandatory upon a public employer to extend a ‘ ‘ right ’ ’ of membership dues deduction to a union ‘‘ certified ” or “ recognized ’ ’ pursuant to the statute. (See, also, Civil Service Law, §§ 204, 212.) Whatever discretion a public employer may have, under the act, to grant .the check-off to a minority union not recognized as a bargaining agent—and that question is not before us — the employer is plainly under no obligation to do so.
Since we find no statutory obstacle in the way of the city’s proposed check-off policy, we turn to a consideration of whether that policy would, as Local 832 urges, deprive it of due process or equal protection of the laws. We agree with the courts below that it would not. The requirements of due process are satisfied as long as the challenged measure is reasonably related to the attainment of a permissible objective. (See, e.g., Railway *607 Employes’ Dept. v. Hanson, 351 U. S. 225, 233-235; Virginian Ry. v. Federation, 300 U. S. 515, 558-559.) Similarly, the standards of equal protection are met if a classification, or a distinction among classes, has some reasonable basis. (See, e.g., Baoostrom v. Herold, 383 U. S. 107, 111; Morey v. Doud, 354 U. S. 457, 464-465; Bucho Holding Co. v. State Rent Comm., 11 N Y 2d 469, 477.)
In the ease before us, the existence of such a reasonable relationship and basis is apparent. The maintenance of stability in the relations between the city and employee organizations, as well as the avoidance of devastating work stoppages, are major responsibilities of the city administration. The Mayor seeks to further these objectives by introducing into city labor relations a practice which has become commonplace in private industry and in the labor policies of other governmental bodies. For example, the Federal Railway Labor Act specifically empowers the carrier and the exclusive bargaining agent to agree on an exclusive dues check-off (U. S. Code, tit. 45, § 152, subd. Eleventh, par. [b]); the practice is authorized for organizations of Federal civil service employees (Code of Fed. Reg., tit. 5, § 550.304, subd. [a], par. [5]; Executive Order 10988, §§ 5, 6, Jan. 17, 1962, 27 Federal Register 551); and it is also followed—according to the record before us — by the New York City Housing Authority and the New York City Transit Authority. The city program is in accord with national labor policy, which has been built on the premise that a majority organization is the most effective vehicle for improving wages, hours and working conditions. (See NLRB v. Allis-Chalmers Mfg. Co., 388 U. S. 175,180.) Be that as it may, we may not consider the merits or the ultimate wisdom of the policy (see Williamson v. Lee Opt. Co., 348 U. S. 483, 488); it is enough, as already indicated, that a method of implementing union security, so widely utilized and so long tested as the one proposed by the Mayor, may not be said to lack a reasonable basis or to be unrelated to the city’s legitimate purposes.
The petitioners also argue that the withdrawal of the dues check-off will weaken their minority union to the point of threatening its very existence. They will thus be deprived, they assert — pointing to such decisions as Bates v. Little Rock (361 U. S. 516), N.A.A.C.P. v. Alabama (357 U. S. 449) and Thomas v. *608 Collins (323 U. S. 516)[5] — of their right of freedom of association guaranteed by the First and Fourteenth Amendments of the Federal Constitution,and by article I of the State Constitution. Their claim lacks substance. Nothing in the city’s labor policy denies members of the petitioners’ union the right to meet, to speak, to publish, to proselytize and to collect dues by the means employed by thousands of organizations of all kinds, that do not have the benefit of a dues check-off. Neither the First Amendment nor any other constitutional provision entitles them to the special aid of the city’s collection and disbursing facilities.
The order appealed from should be affirmed, with costs.
Judges Burke, Scileppi, Bergan, Keating, Breitel and Jasen concur.
Order affirmed.

. In labor relations parlance, the “ check-off ” is the practice whereby an employer -deducts the amount of a union member’s dues from his pay, usually on the employee’s express authorization, and remits it directly to -the union.

. District Council 37 has majority representation status in city-wide units covering over 57,000 employees and in department-wide units covering some 1,300 more. In sharp contrast, Local 832, having an over-all membership in the neighborhood of 1,700, represents only about 1,000 nonsupervisory clerical workers.

. The court at Special Term found that the city had undertaken to issue the proposed check-off order in a collective bargaining agreement with District Council 37 and that such agreement constitutes a “ final determination ” sufficient to provide the basis for review under CPLR article 78. (See Matter of Lipsett v. Gillette, 12 N Y 2d 162, 166.)

. Subdivision 1 of section 93-b reads, in part, as follows: “The fiscal or disbursing officer of every municipal corporation * * * is hereby authorized to deduct from the * * * salary of any employee of such municipal corporation * * * such amount that such employee may specify in writing filed with such * * * officer for the payment of dues in a duly organized association or organization of civil service employees and to transmit the sum so deducted to the said * * * organization. Any such written authorization may be withdrawn by such employee or member at any time by filing written notice of such withdrawal with [such] officer.”

. The petitioners’ reliance on these decisions is misplaced. The cited cases involved attempts by states to hinder organizations by some affirmative prohibition upon, or intrusion into, their activities. There is not the slightest suggestion that a state or other body must provide services to an organization to help it maintain its competitive position with its rivals.