**AFRO–AMERICAN POLICE LEAGUE, Renault Robinson, Howard Saffold, and Jerry Crawley, Plaintiffs,**

v.

**FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7, John M. Dineen, and City of Chicago, Defendants.**

**FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7, Counter-Plaintiffs,**

v.

**AFRO–AMERICAN POLICE LEAGUE, Renault Robinson, Howard Saffold, and Jerry Crawley, Counter-Defendants.**

**FRATERNAL ORDER OF POLICE, CHICAGO LODGE NO. 7, Third-Party Plaintiff,**

v.

**Raymond ARMSTRONG, William C. Bigby, Ocie Brown, Phillip Bryant, Ronald Crawford, Robert P. Ervin, Booker T. Moore, Jimmy Rivers, Albert Rowe, Charles Sias, and James Smith, Third-Party Defendants.**

No. 81 C 4004.

United States District Court, N.D. Illinois, E.D.

Dec. 8, 1982.

Robert W. Hallock, Thomas P. Coffey, Philip S. Beck, Robin P. Charleston, Kirkland & Ellis, Chicago, Ill., Donald E. Scott, Kirkland & Ellis, Washington, D.C., for plaintiffs, counterdefendants and third-party defendants.

Marvin Gittler, Asher, Goodstein, Pavalon, Gittler, Greenfield & Segall, Ltd., Chicago, Ill., for defendant, counterplaintiff and third-party plaintiff Fraternal Order of Police, Chicago Lodge No. 7.

Stanley Garber, Corp. Counsel, Edwin A. Gausselin, Robert L. Janega, Asst. Corp. Counsel, City of Chicago, Chicago, Ill., for defendant City of Chicago.

## OPINION

BUA, District Judge.

### Facts

Plaintiffs, the Afro-American Police League (AAPL), an organization made up primarily of black police officers of the Chicago Police Department, and three black members of the Department who are officials of AAPL, filed the instant lawsuit against the Fraternal Order of Police (FOP), the collective bargaining representative for all Chicago police officers under the rank of sergeant, John M. Dineen, the President of FOP, and the City of Chicago, alleging various civil rights and constitutional violations. The defendants have moved to dismiss the claim under Fed.R. Civil P. 12(b) and have filed a counterclaim and third-party complaint alleging constitutional violations on behalf of the plaintiffs and various third-party defendants. The plaintiffs and the third-party defendants have moved to dismiss the counterclaim and third-party complaint.[1]

In their complaint, the plaintiffs seek to obtain a temporary restraining order and

---

1. For purposes of ease, the plaintiffs and counterdefendants will be generally referred to as "AAPL" or simply as "plaintiffs." The defendants and counterplaintiffs and third-party plaintiffs will be referred to as "FOP" or simply as "defendants." References to the AAPL in the portion of the opinion dealing with the counterclaim and third-party action shall be deemed to speak of the third-party defendants as well as the counterdefendants. Any reference to the "counterclaim" shall be read as a reference to the counterclaim and third-party complaint.

preliminary and permanent injunctive relief enjoining the implementation of the "Agreement between the City of Chicago and the Fraternal Order of Police Chicago Lodge No. 7" (the "Agreement") and related allegedly unlawful conduct. On July 17, 1981, the Court denied the request for a temporary restraining order.

The plaintiff's complaint is rather lengthy and somewhat confusing. As the memoranda filed with the Court reflect, it is difficult to discern exactly what it is that plaintiffs allege constitutes illegal conduct. Nevertheless, the Court has, as it must, construed the complaint in the light most favorable to the nonmoving party. Notwithstanding such construal, for the reasons stated herein, the plaintiffs' complaint is hereby dismissed in its entirety. Likewise, the counterclaim is also dismissed.

## COUNT I

### A.

■ In Count I of its complaint, the AAPL asserts that the agreement between the City and the FOP is racially discriminatory and contrary to the order of the Court in *United States v. City of Chicago,* 411 F.Supp. 218 (N.D.Ill.1976), *aff'd* in pertinent part, 549 F.2d 415 (7th Cir.1977). The agreement at Section 10.2 states:

> The Employer shall not discriminate against officers, and employment related decisions will be based on qualifications and predicted performance in a given position without regard to race, color, sex, religion, or national origin of the officer...

The original decree of the Court in *United States v. City of Chicago* required the promotions to sergeant to consist of 40 percent black and Spanish-surnamed males. This quota system was recently modified so that now only 25 percent of the promotions must involve black and Hispanic officers.

See *United States v. City of Chicago,* 663 F.2d 1354, 1362 (7th Cir.1981).

As the Court stated in its oral ruling of July 17, 1981, no conflict between the agreement and *United States v. City of Chicago* is found. As the Court then stated,

> "The ... agreement specifically prohibits the City from discriminating against any officer on the basis of race, and the provision of such language in the contract does not, in this Court's opinion, affect or evidence any intent to affect the City's duty to comply with the injunction entered by Judge Prentice Marshall ... in the case of *United States v. City of Chicago.* The Court believes and finds that the contract language evidences no intent on the part of the City to violate any duty it has to take affirmative action under the terms of that injunction of the Court."

The complaint fails to assert facts which indicate that compliance with the agreement will contravene the *U.S. v. City of Chicago* decree. While the agreement seeks to proscribe future discrimination and to set a general policy to be followed by the Department, the decree in *U.S. v. City of Chicago* is limited to the promotional scheme and merely seeks to remedy past wrongdoing. The goal sought by all is racial neutrality and the disappearance of bias, prejudice, and discrimination. Were the Court to strike the neutrality clause of the agreement, this goal could not be served. The allegations which assert that the racial neutrality clause violates the Court's decree in *U.S. v. City of Chicago* are therefore dismissed.[2]

### B.

The complaint also asserts that the agreement contains seniority provisions which "build discriminatory effects on the hiring discriminations of the 1970s." These seniority provisions, which on their face are racially neutral, merely require that offi-

---

2. Any alleged violations of the Court's order in *U.S. v. City of Chicago* could properly be brought before Judge Marshall, the District Judge in that case, utilizing a Motion for a Rule to Show Cause. Judge Marshall, in considering a motion to consolidate the instant case with

*U.S. v. City of Chicago,* found the cases unrelated and declined to accept the proposed transfer. According to Judge Marshall, "[T]here are no issues before us comparable or related to those alleged in Count I of (the instant case)."

cers be laid off and reinstated in accordance with their seniority. Furthermore, the agreement states that seniority is a factor to be considered in the promotion of officers.

Under Title VII, a bona fide seniority system which is neutral on its face is protected under Section 703(h), 42 U.S.C. § 2000e–2, notwithstanding a disproportionate impact on minorities, regardless of whether the seniority system in question was adopted before or after the enactment of Title VII. *American Tobacco v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).

■ To state a claim under Title VII, some facts must be alleged which reflect a scheme of intentional discrimination. To be sufficient, such an assertion must be more than a conclusory allegation. In the instant case, plaintiffs' conclusion that intentional discrimination was present in the implementation of the seniority system is apparently based only upon the mere alleged existence of such incidental effects. No other substantive supporting facts are alleged. Such a bare conclusory allegation, without more, cannot survive a motion to dismiss. Therefore, the allegations relating to a violation of Title VII, insofar as they concern the seniority system, are hereby dismissed.

Similarly, the complaint fails to state a cause of action under 42 U.S.C. §§ 1981 and 1983. Under these sections, too, purposeful and intentional discrimination must be alleged. Facts indicating mere incidental discrimination are ineffective to state a claim under these statutes. *Mescall v. Burrus,* 603 F.2d 1266 (7th Cir.1979). The complaint before the Court is devoid of well pleaded facts giving rise to an indication that promulgation of the seniority system was the result of intentional discrimination. Therefore, with regard to the Section 1981 and 1983 claims, the complaint fails to state a claim and is hereby dismissed. Count I is thus hereby dismissed in its entirety.

## COUNT II

### A.

■ In Count II of the complaint, the plaintiffs allege that the League and its members are being unconstitutionally punished by the fact that non-FOP members were not entitled to vote on the ratification of the collective bargaining agreement. This Court noted in its order of June 17, 1981 that there is no duty imposed on the Fraternal Order of Police which requires that nonmembers of the union be allowed to vote on the ratification of the union contract. As the Court stated in *Branch 6000, National Association of Letter Carriers v. NLRB,* 595 F.2d 808 (D.C.Cir.1979):

> The union has responsibility as exclusive bargaining agent to formulate the employees' position on terms and conditions of employment. This responsibility may be delegated by the union membership (to the union). Such delegation is an internal procedure from which nonunion employees properly may be excluded.

*Id.* at 811.

Employees within the bargaining unit who are not union members thus need not be afforded the right to vote on the ratification of a collective bargaining agreement. The only obligation owed such nonmembers by the union is the duty of fair representation. That duty is not violated by the mere failure of the union to allow the nonmembers to vote on the contract. As there is no requirement that nonmembers be allowed to vote, the AAPL has failed to state a claim in this regard. Similarly, no claim has been alleged in the assertion that participation in voting on future agreements is conditioned on membership in the FOP. As the union may restrict voting to union members, it may certainly condition voting on future agreements on membership in the organization.

### B.

■ Section 3.1(A) of the Agreement provides:

> Each officer who on the effective date of this Agreement is a member of the

Lodge, and each officer who becomes a member after that date, shall, as a condition of employment, maintain his membership in good standing during the term of this Agreement.

This maintenance of membership clause, it is asserted, works an onerous burden on League members as it insures the strength and size of the FOP and thus freezes the parties' relative positions as minority and majority unions respectively, not only by a guarantee of sheer numerical size, but also by insuring the availability of the checkoff provision on FOP's behalf.

It is well settled that a maintenance of membership clause, such as that involved in the case at bar, is permissible. *Horwath v. NLRB,* 539 F.2d 1093 (7th Cir.1976). That the instant case involves public employees is of little consequence given that the Supreme Court has stated that public and private employees "are not basically different." *Abood v. Detroit Board of Education,* 431 U.S. 209, 229, 97 S.Ct. 1782, 1796, 52 L.Ed.2d 261 (1977). The League thus cannot claim the denial of rights based solely on the maintenance of membership clause.

## C.

Notwithstanding that they are not entitled to vote, nonmembers clearly benefit from the efforts of the collective bargaining representative and from the union's duty to fairly represent all members of the collective bargaining unit. The litany of benefits traditionally associated with collective bargaining, including increased wages, better working conditions, improved hours, and job security inure to the benefit of nonmembers as well as members. As they do benefit, nonmembers must bear the burden of the costs of any efforts made on their behalf. It is plaintiff's contention, however, that by requiring nonmembers to pay the costs of the collective bargaining process and contract administration, the FOP is impermissibly coercing nonmembers to join the representative organization.

■ It is clear that a bargaining agent organization may tax nonmembers a "fair share" of the costs of bargaining for bene-

fits received by such individuals and that this right exists in public employment settings. In *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court noted that "'the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work ...'" is permissible. *Id.* at 219–220, 97 S.Ct. at 1791, quoting *Railway Employes' Dept. v. Hanson,* 351 U.S. 225, 238, 76 S.Ct. 714, 721, 100 L.Ed. 1112 (1956). Given the permissibility of the collections, the Court does not believe that such activity impermissibly coerces police officers to join FOP. An officer's decision not to join the FOP is presumably made with the realization that he or she will benefit from the efforts of the union. It would be unreasonable to expect that the decision not to join the union would entitle the individual officer to benefit without cost. Thus, the assertion that requiring a nonmember to bear the burden of paying for benefits received is unconstitutional is unfounded and fails to state a claim as a matter of law.

■ Plaintiffs allege that Section 3.3 of the agreement, which authorizes the deduction of union dues from the paychecks of union members and which prohibits similar deductions on behalf of other similar organizations, is unlawful in that the clause has had the alleged effect of "stamped[ing] police officers into resigning from the League and joining FOP." Even assuming such a result to be true, the allegation nevertheless fails to state a claim.

In *Bauch v. City of New York,* 21 N.Y.2d 599, 289 N.Y.S.2d 951, 237 N.E.2d 211 (1968), *cert. denied* 393 U.S. 834, 89 S.Ct. 108, 21 L.Ed.2d 105, the Court of Appeals of New York held that a public employer could grant a dues checkoff privilege to a majority union while simultaneously denying that privilege to a minority union. The Court's holding noted that an exclusive dues checkoff provision is consistent with national labor policy and is the most effective vehicle for the improvement of wages, hours, and working conditions. In reaching its conclusion, the Court cited as persuasive the Rail-

way Labor Act, 45 U.S.C. § 152 at Eleventh (b) and 5 C.F.R. § 550.304(a)(5), 27 Fed. 551 which pertains to federal civil service employees, both of which appear to authorize an exclusive dues checkoff provision.

The heart of plaintiff's claim appears based in the first amendment. It has been noted, however, that while the first amendment protects both the right of an individual to associate with others and the right of an association to engage in advocacy on behalf of its members, it does not "impose any affirmative obligation on the government to listen, to respond, or in this context, to recognize the association and bargain with it." *Smith v. Arkansas State Highway Employees, Local 1315,* 441 U.S. 463, 465, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979), *quoted in Arkansas State Highway Employees, Local 1315 v. Kell,* 628 F.2d 1099 (8th Cir.1980). The City of Chicago need not recognize a minority organization such as the AAPL nor must it acquiesce to the AAPL's request that dues be deducted from its members' paychecks.

As part of its first amendment claim, the AAPL asserts that the failure of the City to recognize a checkoff provision on behalf of the AAPL threatens the very existence of the organization. While that may very well be the effect of the City's refusal, no constitutional violation has been stated in this regard. The City is under no obligation to protect the existence and strength of each minority union claiming a portion of the bargaining unit as its members. Further, as in *Bauch v. City of New York, supra,* there has been no allegation that the City's labor policy denies members of the minority union the right to meet, to speak, to persuade, or to collect dues in the same manner as those organizations who do not enjoy the benefits of the checkoff provision. As the Court stated in *Bauch,* "Neither the First Amendment nor any other constitutional provision entitles them (the minority union) to the special aid of the city's collection and disbursing facilities." *Bauch, supra,* 289 N.Y.S.2d at 955, 237 N.E.2d at 215.

AAPL's claim is equally insufficient under an equal protection challenge. The Su-

preme Court has specifically stated that a challenge of this sort need only meet a relatively relaxed standard of reasonableness. *City of Charlotte v. Local 660, International Association of Firefighters,* 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976). The Court then went on to hold that the practice of allowing withholding only when it benefits all employees is not so devoid of reason as to violate equal protection and is a legitimate method for avoiding the burden of withholding money for all persons or organizations that request a checkoff. In the instant case, as noted above, the amounts withheld on behalf of the FOP are applied so as to benefit all members of the bargaining unit, whether or not the individual employees are members of the union. The same cannot be said with respect to the deductions sought by AAPL. Such deductions would burden the City, yet would benefit only those officers who were members of the minority organization. A policy aimed at limiting the burden imposed upon the City which limits the organizations for which deductions will be made to those which bestow benefits upon the entire work unit is rational and easily meets the requirements of reasonableness. For this reason, the AAPL's assertions that it is being denied equal protection under the law by the City's failure to collect dues on its behalf is without merit.

Notwithstanding the foregoing, the FOP is not given the authority to collect unlimited amounts from police officers not members of the representative union. Indeed, the amounts which may be collected are strictly circumscribed and limited, essentially, to amounts which cover the costs of obtaining the benefits which the nonmembers receive. It is well settled that the dues collected from nonmembers may not be used by the union to finance its political or other causes, especially those which are opposed by the nonmembers or which would run contrary to the exercise of the nonmembers' free will. *Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963); *International Associa-*

*tion of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1960). Where such illegal expenditures have taken place, the nonmember employees will be entitled to restitution of the portion of the funds which were illegally spent as well as an injunction against future like conduct. *Street, supra; Bagnell v. Air Line Pilots Association, International,* 626 F.2d 336 (1980). In the instant case, it is not claimed that such conduct has taken place. Were it that the illegalities had persisted, such conduct would be forbidden and prevented in the future. The complaint at bar, however, does not make a claim in this regard.

The complaint does allege that portions of the FOP's membership dues collected from its members are being used to conduct litigation and other political campaigns which, *inter alia,* attack League-endorsed activities. In this regard, it is not alleged that nonmembers' dues are used to support such activities. Absent such an allegation, the AAPL cannot complain that its rights have been violated. The Court finds nothing in the case law noted above which precludes a union which benefits from an exclusive checkoff provision from utilizing the funds collected in such a manner from its membership to support the political or other activities of the organization. Indeed, it would be naive not to expect that some of that activity would be directed at preserving the status of the union as the exclusive bargaining representative at the expense of the minority union and its activities. While it could certainly be argued that this gives the majority union an unfair advantage, it is nevertheless the law developed to best serve national labor policy most efficiently in the preservation and protection of jobs, wages, and conditions. *See Bauch v. New York, supra,* 289 N.Y.S.2d at 954, 237 N.E.2d at 214.

**D.**

The assertion has been made that League members and other individuals who were not members of the FOP were unfairly excluded from meetings of the FOP concerning nonbargaining matters and that only FOP members were sent copies of the Agreement.[3] The claim arising out of these facts is that League members were denied meaningful information concerning the Agreement and that, if they sought to learn how their futures were to be shaped, they would be forced to join FOP. Further, it is claimed that numerous rumors have been started by FOP representatives which indicate that non-FOP members will not be availed the benefits bestowed upon members of the FOP under the Agreement. The AAPL claims that as a result of being excluded from union meetings and as a consequence of the proliferation of the various misinformation, the "intended effect of eroding the League's financial base" was achieved.

The AAPL cannot meritoriously claim that it had a right to be present at the sessions which concerned nonbargaining matters. Such matters, it would appear, relate to political and other internal union concerns. It is well settled that as to such internal concerns, nonmembers may properly be excluded. *Branch 6000, National Association of Letter Carriers v. NLRB,* 595 F.2d 808 (D.C.Cir.1979).

As to the proliferation of rumors, the AAPL is equally without moment. While the Court does not now decide whether such rumors might substantiate a claim of unfair representation, *see infra,* the proliferation of rumors would appear to be mere political rhetoric protected by the first amendment.

**E.**

Taken as a whole, Count II fails to state a claim. Although the activities and the provisions of the Agreement alleged may well have operated and will continue to operate to severely weaken the AAPL, none of them are in violation of the Constitution

**3.** The League also notes that FOP members received copies of the Agreement only four days prior to the date on which they were to vote on ratification. While the League appears to infer that such a time period was inadequate from the standpoint of the FOP membership, the League is without standing to assert this issue and the matter will not be considered.

or are otherwise illegal. The lawmakers of this country have made the judgment that certain methods of insuring the role of labor in society are to be preferred. These methods unquestionably favor the majority and those in power and, it is hoped, work to preserve the rights of the labor force as a whole. While minority unions may indeed lose power, membership, and strength, and may, in the end, cease to be viable, such a result is neither unexpected nor does it leave labor without a voice. Regardless of union membership, the collective bargaining system requires that the exclusive bargaining agent fairly and vigorously represent each individual member of the bargaining unit.

The AAPL is clearly a minority union. Undeniably, an entity with such a status must wage an uphill battle and must combat the advantages given, statutorily and otherwise, to a majority union such as FOP. Nevertheless, the methods used by FOP, both in the Agreement and by the conduct as alleged, are not illegal and violated no rights of the AAPL. For these reasons, Count II of the plaintiff's complaint is hereby dismissed.

### Count III

Count III of the plaintiff's complaint alleges that the FOP has breached the duty of fair representation which it owes to all members of the bargaining unit including, *inter alia,* members of the AAPL and other nonmembers of the FOP. Unlike the other counts involved in the instant case, which are based in the U.S. Constitution and various federal statutes, Count III is based solely in the common law and is included as a pendent claim. As the employer in the case at bar is a state public entity, the case falls within the spectrum of cases not covered by the National Labor Relations Act, 29 U.S.C. § 151 et seq., or the Railway Labor Act, 45 U.S.C. § 151 et seq., or any other federal law. The duty of fair representation owed in the instant case thus arises solely from the common law.

Since *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it has been clear that generally common law claims are state law claims. The duty owed in the case at bar thus arises under state law and is not a federal claim. Where, as here, the federal claims have been dismissed before trial, the state claims should also be dismissed where no independent basis for jurisdiction exists, even though such claims may not be insubstantial. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). As this Court is without jurisdiction over the plaintiff's common law claims standing alone, Count III of plaintiff's complaint is hereby dismissed *sua sponte.*

### COUNTERCLAIM AND THIRD–PARTY COMPLAINT

#### A.

The FOP has filed a counterclaim and third-party action which alleges that the plaintiffs and counterdefendants and the third-party defendants have violated the Civil Rights Acts of 1866 and 1871, 42 U.S.C. § 1985(3) by conspiring to deprive the FOP and the class of police officers who either had joined or had sought to join the FOP of their first amendment rights of association. The AAPL and the individual counterdefendants and third-party defendants have moved to dismiss the third-party action and counterclaim for failure to state a claim.

It is alleged that the counterdefendants and the third-party defendants conspired to deprive the FOP and the relevant class of policemen of the right to associate. It is also alleged that, in furtherance of the conspiracy, the third-party defendants and counterdefendants published and circulated a flyer which stated that the AAPL would not allow its members to become members of the FOP without forfeiting their membership in the AAPL. The flyer further instructed the officers to "leave FOP now and join AAPL or forever hold your peace."

The motion to dismiss asserts that the counterclaim fails to state a claim in that 42 U.S.C. § 1985(3) does not afford a remedy for injuries which may be sustained as a result of alleged violations of the first amendment by a private entity.

██ As a general rule, allegations based upon the denial of first amendment rights are not cognizable under 42 U.S.C. § 1985(3). *Murphy v. Mount Carmel High School,* 543 F.2d 1189 (7th Cir.1976); *Egan v. City of Aurora,* 291 F.2d 706 (7th Cir. 1961); *Oaks v. City of Fairhope, Ala.,* 515 F.Supp. 1004 (S.D.Ala.1981). Under Section 1985(3), a claimant must allege a conspiracy which contemplates the deprivation of a federally protected right. In *Cohen v. Illinois Institute of Technology,* 524 F.2d 818 (7th Cir.1975), the Court recognized that in two situations is this requirement met: first, where there is state action which violates the claimant's rights, and second, where the right at stake is one which is entitled to protection from infringement against anyone rather than merely from impairment by the state.

██ In the instant case, neither facet of this two-part test is met. First, the FOP does not allege state action. Second, under the current law of the Seventh Circuit, the FOP has not alleged that there has been any violation of any constitutional right entitled to protection from private infringement.

It is well settled in the Seventh Circuit that the guaranties of the first amendment apply only to proscribe the actions of the federal government and, by the incorporation of the first amendment into the fourteenth, the actions of the states. *Murphy v. Mount Carmel High School,* 543 F.2d 1189 (7th Cir.1976); *Bianco v. American Broadcasting Companies, Inc.,* 470 F.Supp. 182 (N.D.Ill.1979). Even where the alleged injury arises from an otherwise cognizable private conspiracy, a claim based on the First Amendment is not recognized. 543 F.2d at 1192.

Similarly, the fourteenth amendment does not open the gates to alleged violations arising from a private conspiracy. The fourteenth amendment "erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley v.*

*Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). Hence, it has been held that where a complaint under Section 1985(3) rests on the fourteenth amendment, a private conspiracy is not actionable. *Williams v. St. Joseph Hospital,* 629 F.2d 448, 451 (7th Cir.1980); *Bianco v. American Broadcasting Companies,* 470 F.Supp. 182, 184 (N.D.Ill.1979).

In *Murphy v. Mount Carmel High School,* 543 F.2d 1189 (7th Cir.1976), the Court considered issues similar to those involved in the case at bar. In that case, the appellant complained that his dismissal from a private high school was a violation of his rights under the first amendment. It was asserted that the dismissal arose from Murphy's openly advocating his positions on racial and other matters. Notwithstanding the racial overtones of the case and appellant's assertions that the alleged conspiracy was motivated by an apparent racial animus, the Court held that the Section 1985(3) claim was not cognizable. The Court's holding noted that in cases involving a right protected by the fourteenth amendment, it is clear that the requirement of state involvement survives *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), which allowed a Section 1985(3) action to proceed against a purely private conspiracy which was motivated by racial animus and which sought to deprive certain black individuals of their equal rights. Notwithstanding the holdings of the Third and Eighth Circuits to the contrary,[4] the Seventh Circuit specifically stated that the First and Fourteenth Amendments may only be asserted as a shield to government action. 543 F.2d at 1194.

Notwithstanding that the law of this Circuit, as set out above, appears to be clear, the counterplaintiffs and third-party plaintiffs argue that under *Griffin v. Breckenridge,* a Section 1985(3) claim is cognizable even under the First Amendment, where a racial or otherwise class based animus is alleged. While clearly not the law of this

---

4. *See Richardson v. Miller,* 446 F.2d 1247 (3d Cir.1971); *Action v. Gannon,* 450 F.2d 1227

(8th Cir.1971) (en banc).

Circuit, even were it the law such an assertion would be inapplicable to the case at bar.

Apparently underlying the prolix allegations of the case-in-chief are assertions of racial discrimination and class based animus. Even if the Court were to find that a claim was stated in the case-in-chief, which it does not, it is nevertheless apparent that the conspiracy alleged in the counterclaim and third-party claim does not seek to deprive individuals of their rights because of any class-based or otherwise discriminatory animus recognizable under Section 1985(3).

The class alleged to have been the victim of the alleged denial of rights is "the FOP and/or police officers who joined the said FOP ... or the class of persons who sought membership in the FOP." *Griffin* held only that a class determined by racial characteristics came within the statute's protection. It appears that this requirement has been extended to include classes based on ethnic origin, sex, religion, and political loyalty. *Murphy,* 543 F.2d at 1192 n. 1 (noting that a class made up of nonunion employees probably did not meet the requirements of *Griffin*). The class alleged in the case at bar does not appear to meet the requirements of *Griffin.* It is not based on race, ethnic origin, sex, religion, or political loyalty. As in *Murphy,* the class is relatively small and is subject to change. Thus, even if the law of the Circuit recognized a claim against private conspiracies pursuant to Section 1985(3) for violations of the First and Fourteenth Amendments, as the class alleged in the instant case does not meet the requirements of *Griffin* and its progeny no claim could here be stated.

B.

■ Having shown the basis of FOP's allegations to be fatally flawed, it is unnecessary for this Court to address the affirmative defense raised by AAPL. However, given the significance of this assertion, some discussion would seem to be in order.

FOP attempts to attach culpability to AAPL's act of pamphleteering, arguing that under *Griffin,* "any act in furtherance of the object of the conspiracy" even if that act is not unlawful, is actionable. In opposition, AAPL argues quite correctly that pamphleteering is an activity protected by the First Amendment. *Martin v. City of Struthers, Ohio,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). The *Griffin* test, which attaches culpability to racial animosity and racial motivation, is wholly inapplicable. First amendment protection does not depend on motivation; it depends on the nature of the defendant's conduct. *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212 (1972), *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). It is clear that direct threats and acts of violence are actionable under 1985(3); private conspiracies culminating in such reprehensible conduct are intolerable. However, no such conduct is evident in the instant case. In fact, no act has been committed by AAPL which would take their conduct outside the protection of the First Amendment. The Supreme Court has held that even clear racial overtures, and speech that "invites dispute ... induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger" are among the high purposes of the First Amendment. *Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), *Collin v. Smith,* 578 F.2d 1197 (7th Cir.1978).

The act of pamphleteering is one of the few modes of mass communication economically available to minority groups, and the activity is clearly protected by the First Amendment. A "conspiracy to exercise free speech" is an obvious oxymoron. Even in a light most favorable to FOP's position, AAPL's leafleting cannot reasonably be punishable under 1985(3) as argued by FOP. To allow punishment of AAPL would clearly "chill" future free expression. That result is most undesirable and must be avoided. AAPL's activity is well within those First Amendment guarantees which must be jealously guarded by the courts and cannot be reached by FOP's claim.

### C.

As the counterclaim and third-party complaint fails to state a claim under Section 1985(3), it is hereby dismissed. As no outstanding claims remain, this cause is hereby dismissed in its entirety.

IT IS SO ORDERED.