OPINION OF THE COURT
Chief Judge Wachtler.
The question on this appeal is whether the Mayor of the City of New York has the authority to promulgate an Executive Order prohibiting employment discrimination by city contractors on the basis of “sexual orientation or affectional preference.” The Appellate Division held that the Mayor had this power. We disagree and hold that because of the separation of powers delineated in the City Charter, the Mayor has no authority to initiate such a policy.
I.
On April 25, 1980, the Mayor of the City of New York issued Executive Order No. 50 “to ensure compliance with the equal employment opportunity requirements of City, State and Federal law in City contracting” (Executive Order No. 50 § 1). The Executive Order applies to virtually every contract with the city, and requires that those entering into such contracts agree to ensure “equal employment opportunity” in all of their employment decisions. “Equal employment opportunity,” as defined in section 3 (i) of the order, includes not discriminating on the basis of “sexual orientation or affectional preference,” terms which all parties agree refer to a person being homosexual or bisexual rather than heterosexual. The order provides that the Mayor’s Bureau of Labor Services has the responsibility to implement, monitor compliance with, and enforce these equal employment requirements.
Pursuant to this grant of authority, the Bureau of Labor Services promulgated regulations, effective January 21, 1982, which require that specific language implementing Executive Order No. 50 be inserted into contracts with the city. In the required language, a contractor agrees, among other things, not to discriminate in any employment decision on the basis of “sexual orientation or affectional preference” and to state that condition in all solicitations or advertisements for employees.
Agudath Israel and the Salvation Army, the plaintiffs in two of three actions consolidated on appeal, are not-for-profit religious and charitable corporations. Both have annual contracts with the city, pursuant to which they provide social services *354 such as day care facilities, counseling services, and senior citizen centers, and the city pays a portion of the costs of such services. The plaintiffs in the third action (the “Under 21” action) are not-for-profit corporations under the sponsorship of the Roman Catholic Archdiocese of New York, and they too provide social service programs partially funded through annual contracts with the city.
The plaintiffs in all three actions object on religious grounds to signing a contract in which they would agree not to discriminate on the basis of “sexual orientation or affectional preference,” and have advised the city that they will not sign any contracts which contain such a condition. The city, in turn, has notified the plaintiffs that the contracts for the services they provide will not be renewed unless plaintiffs are in full compliance with Executive Order No. 50 and the Bureau of Labor Services’ regulations promulgated thereunder, including the provision for insertion of the objected-to language into all the contracts.
Faced with the expiration of their contracts, plaintiffs brought three separate actions, each seeking a declaration that the portion of Executive Order No. 50 pertaining to “sexual orientar tion or affectional preference” is beyond the scope of the Mayor’s authority, and thus void, and a permanent injunction against enforcement of this part of the order and the regulations implementing it.[1]
The plaintiffs in all three actions moved for summary judgment, and the motions were referred to the same Justice at Special Term. Special Term held that the challenged portion of Executive Order No. 50 was an impermissible usurpation of legislative power by Mayor Koch, and, in three separate judgments, declared that portion unlawful and permanently enjoined the city and the Mayor from enforcing it.
*355 The Appellate Division consolidated the three appeals by the defendants,[2] and in a split decision, disagreed with Special Term’s conclusion that the Mayor had exceeded his authority insofar as Executive Order No. 50 related to “sexual orientation or affectional preference”. Rejecting the separation of powers concerns expressed by Special Term and the dissenting Justice at the Appellate Division, the majority at the Appellate Division characterized those principles as “vestigial relics * * * relied upon for State court holdings in fewer and fewer desultory cases”, and concluded that the Mayor “did no more than make express the policies and principles [of equal protection] already firmly embedded in our State and Federal Constitutions.” (108 AD2d, at pp 258-259.) Upon “search of the record,” the Appellate Division granted defendants summary judgment declaring Executive Order No. 50 and the regulations promulgated thereunder constitutional and valid.[3]
II.
The plaintiffs’ contention that the Mayor lacked the authority to proscribe discrimination by city contractors on the basis of “sexual orientation or affectional preference” is a facial attack on this portion of Executive Order No. 50, and our resolution of the case does not depend on the status of the plaintiffs as religious organizations. Nor do we decide today the extent to which New York City may regulate the employment practices of those with whom it does business. Rather, the sole issue we address is the extent of the authority in this area of the chief executive officer of the city, the Mayor, and specifically, whether the executive may forbid discrimination by city contractors on a ground not covered by any legislative enactment.
One of the fundamental principles of government underlying our Federal Constitution is the distribution of governmental power into three branches — the executive, legislative and judicial — to prevent too strong a concentration of authority in one person or body (see, Youngstown Co. v Sawyer, 343 US 579; id., at pp 634, 635 [Jackson, J., concurring]; 1 Story, Commentaries on the Constitution § 525 [5th ed]). We have consistently recognized that this principle of separation of powers among the three branches is included by implication in the pattern of *356 government adopted by the State of New York (see, e.g., Matter of LaGuardia v Smith, 288 NY 1, 5-6; Matter of County of Oneida v Berle, 49 NY2d 515, 522), and, contrary to the Appellate Division’s characterization of the doctrine as a “vestigial relic,” we have very recently unanimously reaffirmed its continuing vitality (see, Subcontractors Trade Assn. v Koch, 62 NY2d 422, 427). While the doctrine of separation of powers does not require the maintenance of “‘three airtight departments of government’ ” (Nixon v Administrator of Gen. Servs., 433 US 425, 443; 1 Story, Commentaries on the Constitution § 525, supra), it does require that no one branch be allowed to arrogate unto itself powers residing entirely in another branch (Youngstown Co. o Sawyer, supra; Matter of Nicholas v Kahn, 47 NY2d 24, 30-31).
Of course, the pattern of government established for New York City by the City Charter is not identical to that of the United States or the State of New York. Still, the City Charter does provide for distinct legislative and executive branches: the City Council “shall be vested with the legislative power of the city, and shall be the local legislative body of the city” (New York City Charter, ch 2, § 21), while the Mayor “shall be the chief executive officer of the city” (id., ch 1, § 3). Thus, our prior decisions have held that, no matter how well-intentioned his actions may be, the Mayor may not unlawfully infringe upon the legislative powers reserved to the City Council (see, Subcontractors Trade Assn. v Koch, supra; Matter of Fullilove o Beame, 48 NY2d 376; Matter of Broidrick o Lindsay, 39 NY2d 641).
The authority conferred upon the Mayor, as chief executive officer, does, of course, include the power to enforce and implement legislative enactments (Subcontractors Trade Assn. v Koch, 62 NY2d, at p 427, supra). Indeed, if the City Council were to enact valid legislation proscribing discrimination by city contractors, or employers within the city generally, on the basis of “sexual orientation or affectional preference,” the Mayor would have the duty to enforce it. The City Council, however, has never enacted any such law despite the introduction of bills which would have done so. The New York City Human Rights Act, in defining the types of “unlawful discriminatory practices” which an employer may not engage in, contains no reference to “sexual orientation or affectional preference,” or to any similar classifications (Administrative Code of City of New York § Bl-7.0). Similarly, Administrative Code § 343-8.0, which restricts discriminatory employment practices by many city contractors, contains no such classification.
*357 The relevant provisions of State law are closely akin to those of the city. The State Human Rights Law, which covers employment discrimination (Executive Law § 296), does not include among the protected classifications anything analogous to “sexual orientation or affectional preference,” nor does Labor Law § 220-e, which mandates the inclusion of an antidiscrimination provision in most State and municipal contracts, encompass any such category. Finally, there is no Federal statute which the Mayor might be implementing. Title VII of the 1964 Civil Rights Act (42 USC § 2000e), the employment discrimination provision of Federal civil rights legislation, does not include homosexuals or bisexuals among the protected classes of employees (see, e.g., DeSantis v Pacific Tel. & Tel. Co., 608 F2d 327; Blum v Gulf Oil Corp., 597 F2d 936).
The issue we face, therefore, is whether the Mayor, in including within the coverage of Executive Order No. 50 “sexual orientation or affectional preference,” despite the fact there is no legislative enactment prohibiting employment discrimination on such a basis, acted within the scope of his authority as the chief executive officer of the city.
III.
Defendants contend that the Mayor’s authority to promulgate the challenged portion of Executive Order No. 50 stems from two aspects of his functions as executive — the power to regulate the terms of city contracts, and the power or duty to prevent the city from engaging in or funding discriminatory conduct which violates the equal protection clauses of the Federal and State Constitutions. We address each of these arguments in turn.[4]
A.
Under section 8 (a) of the City Charter, the Mayor has all of the residual powers of the city. Thus, in Matter of Bauch v City of New York (21 NY2d 599, 605), we noted that the Mayor had the authority to enter into contracts on the city’s behalf and to determine the manner of transacting its business and affairs. Defendants contend that this power to regulate the terms of the *358 city contracts gives the Mayor the authority to forbid parties who contract with the city from discriminating on the basis of “sexual orientation or affectional preference”.
In Matter of Broidrick v Lindsay (39 NY2d 641, supra) and Matter of Fullilove v Beame (48 NY2d 376, supra), we held that attempts by the Mayor of New York City to mandate some type of affirmative action in employment decisions by city contractors were impermissible infringements upon the legislative power because they utilized a remedial device which, rather than implementing a legislative policy, enacted a new policy not embraced by the City Council. Defendants rely on language in Broidrick and. Fullilove approving executive action which “ ‘only would enlarge the pool of persons eligible for employment based on discrimination-free merit selection’ ” (Matter of Fullilove v Beame, 48 NY2d, at p 379, supra; Matter of Broidrick v Lindsay, 39 NY2d, at p 649, supra). This statement, however, was not intended to authorize the executive to enact his own views of what persons should be protected from employment discrimination without regard to the laws enacted by the Legislature. Rather, approval of enlarging the pool of employees was in reference to an executive implementing appropriate remedial relief to enforce a legislative policy.
Two other decisions from this court further explicate this distinction. In Rapp v Carey (44 NY2d 157), we invalidated a Governor’s Executive Order requiring a broad range of State employees within the executive branch, including many not subject to removal by the Governor, to file financial disclosure statements and to abstain from various political and business activities not otherwise prohibited. We held that the order in question went beyond the powers of the Governor, including the power to implement legislation, and unlawfully “assume[d] the power of the Legislature to set State policy in an area of concededly increasing public concern” (id., 44 NY2d, at p 160). Most recently, in Subcontractors Trade Assn. v Koch (supra), we held that the Mayor of New York City did not have the authority to mandate that at least 10% of all construction contracts awarded by the city be given to “locally based enterprises,” as such an order went beyond the Mayor’s “function of implementing general Charter-conferred powers” {id., 62 NY2d, at p 429). Of particular relevance here is our recognition in Subcontractors that “the general power to enter into contracts which is bestowed upon the executive branch of government ordinarily cannot serve as a basis for creating a remedial plan for which the executive never received a grant of legislative power” {id., at p 428).
*359 Thus, as Special Term recognized, our prior cases hold that an executive may not usurp the legislative function by enacting social policies not adopted by the Legislature. Private employers in this State are free to make employment decisions on whatever basis they choose, as long as the basis is not prohibited by law (cf. O’Connor v Eastman Kodak, 65 NY2d 724; Murphy v American Home Prods. Corp., 58 NY2d 293). Congress, the State Legislature and the City Council have enacted laws restricting the bases upon which most private employers may discriminate. None of these legislative bodies, however, has chosen to include a person’s “sexual orientation or affectional preference” among the proscribed bases, nor have they established any general requirement that employment decisions must be merit-based. An attempt by the Mayor to broaden the class of persons protected from discrimination by private employers, or to require that all employment decisions be merit-based, however commendable, is an enactment of policy which the City Charter leaves to the City Council.[5] Accordingly, the challenged portion of Executive Order No. 50 does not fall within the Mayor’s Charter-conferred power to regulate the terms of city contracts.
B.
The second basis put forth by the defendants for upholding the validity of the portion of Executive Order No. 50 covering “sexual orientation or affectional preference” is that the Mayor is properly acting to ensure compliance with constitutional guarantees of equal protection. The Appellate Division majority accepted this argument, concluding that the Mayor has the constitutional obligation, stemming from the equal protection *360 clauses of the Federal and State Constitutions, to prevent all organizations contracting with the city from engaging in invidious discriminatory employment practices, which would include discrimination on the basis of sexual orientation.
Section 1 of the 14th Amendment to the United States Constitution provides in part that “No State shall * * * deny to any person within its jurisdiction the equal protection of the laws.”[6] This provision extends, of course, to subdivisions of a State, such as New York City (see, e.g., Hunter v Erickson, 393 US 385). Plaintiffs contend, however, that the Mayor is attempting to “enforce” the equal protection requirements of the 14th Amendment in a manner which is reserved to Congress. Section 5 of the 14th Amendment states that “Congress shall have power to enforce, by appropriate legislation, the provisions of this [Amendment].” The significance of this section is that it gives to Congress some authority to effectively enlarge the substantive reach of the equal protection clause by enacting laws prohibiting certain action even though such action would not otherwise be found by the judiciary to violate equal protection (see, Katzenbach v Morgan, 384 US 641; United States v Guest, 383 US 745, 774 [Brennan, J., concurring]; Tribe, American Constitutional Law, at 28-29, 265-267; cf. City of Rome v United States, 446 US 156 [enforcement of 15th Amend]).
Although the Mayor does have a responsibility to uphold the United States Constitution, and a duty to prevent actions by the city which would violate the 14th Amendment’s requirement of equal protection, as interpreted by the judiciary, he does not have the power to expand the coverage of the equal protection clause. The Mayor, unlike Congress, has no authority to prohibit *361 discrimination merely because he feels that the prohibition furthers the goals of the 14th Amendment. His duty extends only to the prohibition of such discrimination if it in fact violates that provision. Accordingly, the Mayor’s inclusion of “sexual orientation or affectional preference” in Executive Order No. 50 can be upheld under the 14th Amendment only if either discrimination on this basis by city contractors would violate the equal protection clause, or if the city would be violating the clause by contracting with those who so discriminate.
The prohibitions in the 14th Amendment are directed at the “State,” and they “ ‘erect no shield against merely private conduct, however discriminatory or wrongful’ ” (Blum v Yaretsky, 457 US 991,1002, quoting Shelley v Kraemer, 334 US 1,13; see, Jackson v Metropolitan Edison Co., 419 US 345, 349). In order for a court to conclude that there is “State action,” thus making equal protection requirements applicable, the alleged discriminatory conduct of a private employer must be “fairly attributable to the State” (Lugar v Edmondson Oil Co., 457 US 922, 937; see, Matter of Wilson, 59 NY2d 461, 476).
The Supreme Court has yet to formulate a single test which can be employed to determine whether there is the requisite degree of State involvement (see, Reitman v Mulkey, 387 US 369, 378), and all the facts and circumstances of a particular case must be considered (Burton v Wilmington Parking Auth., 365 US 715, 722). It is clear, however, that the mere fact that a private entity contracts with the government (see, e.g., Blum v Yaretsky, supra), is regulated by the government (see, e.g., Jackson v Metropolitan Edison Co., 419 US 345, supra), or performs a function also performed by the government (see, e.g., Rendell-Baker v Kohn, 457 US 830), is not enough by itself to treat it as a State actor. Rather, there must be some basis for finding that the State is “responsible” for the private conduct (Blum v Yaretsky, 457 US, at p 1004, supra), either because it maintains such a close relationship with the private actor that it can be viewed as a joint participant in all decisions of the latter (see, Burton v Wilmington Parking Auth., 365 US 715, supra), because it allows the private actor to perform a function traditionally the exclusive prerogative of the State (see, e.g., Evans v Newton, 382 US 296), or because it requires or otherwise encourages the challenged conduct of the private actor (see, e.g., Peterson v City of Greenville, 373 US 244).
There are no facts or circumstances pointed to by defendants or otherwise apparent which could make the city responsible for the employment decisions of the plaintiffs or of city contractors *362 generally. The Supreme Court’s recent decision in Rendell Baker v Kohn (supra), virtually compels the conclusion that their conduct is not attributable to the city and thus cannot be said to violate the 14th Amendment. In Rendell-Baker, the entity in question was a privately operated high school in Massachusetts for maladjusted students. Virtually all of the school’s students were referred to it by city school committees and the State, and pursuant to contracts with these governmental entities, the school received funding which paid for most of the costs of educating these students. In an action brought by a discharged employee against the school, the Supreme Court held that the school’s personnel decisions were not State action, even though it received public funds, its business consisted almost exclusively of performing public contracts, and it performed a “public function,” where the government did not influence or coerce those decisions.
Thus, Executive Order No. 50, in prohibiting discrimination by city contractors on the basis of “sexual orientation or affectional preference,” is not prohibiting conduct covered by the 14th Amendment. The defendants contend, however, that even if the employment decisions of organizations contracting with the city are not State action, the city itself would be in violation of the 14th Amendment if it contracts with an entity which discriminates on the basis of “sexual orientation or affectional preference,” and the Mayor, therefore, is fulfilling his duty to prevent this violation. This contention is superficially appealing, but cannot withstand closer analysis.
Neither this court nor the Supreme Court has ever held that the government may have no contacts with a private entity which discriminates or otherwise acts in a manner in which the government itself could not. Furthermore, while there is a distinction between seeking to hold a private actor responsible under the 14th Amendment for discriminatory conduct and seeking to enjoin governmental involvement with that actor (Blum v Yaretsky, 457 US, at pp 1003-1004, supra; Note, State Action: Theories For Applying Constitutional Restrictions To Private Activity, 74 Colum L Rev 656, 698-699), the considerations of State action applicable to the former are also relevant to the latter (Blum v Yaretsky, 457 US, at p 1004, supra).
Defendants rely heavily on the Supreme Court’s decision in Norwood v Harrison (413 US 455), in which the court enjoined the State of Mississippi from lending textbooks to private schools with racially discriminatory admissions policies. The court concluded that, although the textbook lending program *363 had not been implemented in order to further racial segregation, as it applied to all private schools and had begun prior to the desegregation of the public schools, the State was granting “tangible financial aid [which] has a significant tendency to facilitate, reinforce, and support private discrimination” {id., 413 US, at p 466).
There are several crucial distinctions between Norwood and this case. To begin, the Supreme Court found that the State’s action in Norwood was effectively promoting the discrimination by the private actors (see, Gilmore v City of Montgomery, 417 US 556, 568-569). In contrast, there is no evidence that the city, by contracting for goods or services with a private organization, would be promoting any discriminatory acts by that organization (cf. Novack, Rotunda & Young, Constitutional Law, at 520 [2d ed]). Additionally, while the State in Norwood was gratuitously providing aid to the private entities, the city, in entering into contracts, is purchasing items it requires or fulfilling obligations it has, thus further negating any assertion that it is promoting the discriminatory acts.
Perhaps the most significant distinction between Norwood and this case is that the former involved governmental entanglement in racial discrimination. The Supreme Court has consistently recognized that the central purpose underlying the equal protection clause was to prevent governmental conduct discriminating on the basis of race, and that any such discrimination is subject to the most exacting scrutiny (see, e.g., Palmore v Sidoti, 466 US 429, 104 S Ct 1879, 1881-1882; Washington v Davis, 426 US 229, 239). Consequently, it has become apparent that where racial discrimination by a private actor is involved, a lesser degree of State involvement than would otherwise be required will support a finding of “State action” (see, Adickes v Kress & Co., 398 US 144, 190-191 [Brennan, J., concurring in part, dissenting in part]; Taylor v Consolidated Edison Co., 552 F2d 39, 42, cert denied 434 US 845; Note, State Action: Theories For Applying Constitutional Restrictions To Private Activity, 74 Colum L Rev 656, 657-658, 661). More generally, government has been permitted fewer contacts with private actors engaged in racial discrimination than with those otherwise acting in a manner which the government itself could not (see, e.g., Granfield v Catholic Univ., 530 F2d 1035, 1046, n 29, cert denied 429 US 821; compare, e.g., title VI of the Civil Rights Act, 42 USC § 2000d [prohibiting racial discrimination in any activity or program receiving Federal financial assistance, without exception], with title IX of the Educational Amendments of 1972, 20 *364 USC § 1681 et seq. [prohibiting sex discrimination in any educational program or activity receiving this assistance, but with several exemptions]; Norwood v Harrison, supra, with Board of Educ. v Allen, 392 US 236).
Courts have uniformly refused to apply the same level of scrutiny applied to racial classifications in determining equal protection challenges to classifications based on sexual orientation (see, e.g., Rich v Secretary of Army, 735 F2d 1220, 1229; Hatheway v Secretary of Army, 641 F2d 1376, 1382, cert denied 454 US 864; DeSantis v Pacific Tel. & Tel. Co., 608 F2d, at p 332, supra). We need not decide now whether some level of “heightened scrutiny” would be applied to governmental discrimination based on sexual orientation (see, Hatheway v Secretary of Army, 641 F2d, at p 1382, supra; Note, An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality, 57 S Cal L Rev 797, 810-834; Note, Challenging Sexual Preference Discrimination in Private Employment, 41 Ohio St U 501, 513-514). Rather, we conclude only that the equal protection clause does not ordinarily prevent the city from contracting with private employers who discriminate on this basis, as the existence of the contract would not, by itself, make the city “responsible” for the private employment decisions so as to invoke constitutional protections (see, Blum v Yaretsky, 457 US, at p 1004, supra). Thus, we reject defendants’ contention that the prohibition in Executive Order No. 50 against discrimination by city contractors on the basis of “sexual orientation or affectional preference” is necessary to prevent the city from aiding or engaging in a violation of the 14th Amendment.
As we have found that the Mayor lacked any authority to promulgate the challenged portion of Executive Order No. 50, we hold that this portion was an unlawful usurpation of the legislative power of the City Council. Accordingly, the order of the Appellate Division should be modified by reinstating the orders and judgments at Special Term.

. The plaintiffs in the Under 21 action included in their complaint a similar facial challenge to all of Executive Order No. 50 as well as a challenge to all of Executive Order No. 50, as applied to religious or religiously sponsored corporations. We reject the argument that the Mayor may not enforce existing State and city laws prohibiting employment discrimination through the establishment of an additional “enforcement mechanism” (the Mayor’s Bureau of Labor Services), and thus decline to hold all of Executive Order No. 50 invalid on its face.
As to the second additional challenge, we cannot on the record before us determine the extent to which 1st Amendment and 14th Amendment concerns would be implicated by enforcement of the various aspects of the order on the Under 21 plaintiffs, and we thus decline to issue an advisory opinion on whether the Mayor may regulate the employment practices of a religious corporation contracting with the city.

. Plaintiffs in the Under 21 action cross-appealed from the judgment at Special Term insofar as it did not invalidate all of Executive Order No. 50 (see, n 1, supra).

. The Appellate Division order “modifies” the Special Term judgments as it affirms the judgment in the Under 21 action insofar as it did not invalidate all of Executive Order No. 50.

. At Special Term, defendants asserted as a third basis for validating all of Executive Order No. 50 an alleged “ratification” through a resolution of the New York City Board of Estimate. Defendants have since abandoned any reliance on the Board of Estimate’s actions in attempting to uphold the order, and none of the complaints in the actions before us seeks to invalidate any Board of Estimate resolutions. Thus, the issue of whether the Board of Estimate may require that all contracts submitted to it for approval must prohibit discrimination by the contractor on the ground of “sexual orientation or affectional preference” is not before us on this appeal.

. We reject the dissent’s argument that the challenged portion of Executive Order No. 50, by restricting non-merit-based discrimination, is permissible as an attempt by the Mayor “to ensure that the city receive the greatest value for the lowest possible cost” (dissenting opn, at p 367). To begin, as the most apparent consequence of the enforcement of this part of the order would be a reduction in the number of entities willing to contract with the city, it is unclear how the city would economically benefit from such enforcement. If a city agency feels that the price of a particular contract is too high due to a contractor’s employment policies, it is of course free to choose some other contractor. More significantly the dissent itself concedes that Executive Order No. 50 is an enactment of social policy, notwithstanding the economic arguments now set forth by defendants, and thus is akin to the remedial plan in Subcontractors which we unanimously held invalid. The Federal cases cited by the dissent in support of this argument (dissenting opn, at p 368) are distinguishable, as those courts were construing a specific grant of authority to the executive by Congress. Any dictum in those cases that the president has the authority to regulate the employment practices of government contractors even absent authorization by Congress was rejected by a more recent Federal case (see, Liberty Mut. Ins. Co. v Friedman, 639 F2d 164, 167-172, n 13).

. We have held that the State constitutional equal protection clause (NY Const, art I, § 11) is no broader in coverage than the Federal provision (see, e.g., Matter of Esler v Walters, 56 NY2d 306, 313-314) and this equation with the Federal provision extends to the requirement of “State action” in order for the equal protection clause to be applicable (Dorsey v Stuyvesant Town Corp., 299 NY 512, 530-531, cert denied 339 US 981). In Dorsey, we recognized that the State provision approved at the Constitutional Convention of 1938 and adopted by the electorate that same year, was designed simply to “ ‘embodty] in our Constitution the provisions of the Federal Constitution which are already binding upon our State and its agencies’ ” (id., at p 530 [quoting from 2 Rev Record of NY State Constitutional Convention, 1938, at 1065]). The dissent’s reliance on Sharrock v Dell Buick-Cadillac (45 NY2d 152) is misplaced, as that case concerned the interpretation of the due process clause in the State Constitution (art I, § 6), a provision enacted prior to, and containing language materially different from, its counterpart in the 14th Amendment, and thus readily supporting a broader interpretation than the Federal provision. Accordingly, we need only analyze the equal protection issue under the framework of the 14th Amendment.