BRANCH 6000, NATIONAL ASSOCIA-
TION OF LETTER CARRIERS (United
States Postal Service, West Islip, New
York), Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 77–1979.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 5, 1978.
Decided Jan. 19, 1979.

Peter J. Carre, Washington, D. C., with whom Mozart G. Ratner, Washington, D. C., was on the brief, for petitioner.

John H. Ferguson, Atty., N. L. R. B., Washington, D. C., with whom John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on the brief, for respondent.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

In this case the petitioner union ("Branch 6000") adopted a procedure whereby a term and condition of employment was determined by a referendum of the union membership. The NLRB found that under the circumstances of this case, with the vote based on the individual preferences of the union members, without any consideration of the interests of the non-union employees, the union breached its obligation to represent fairly the interests of all employees in the bargaining unit. The Board found an unfair labor practice under section 8(b)(1)(A) of the National Labor Relations Act ("NLRA" or the "Act").[1] We affirm.

1. 61 Stat. 136, *as amended,* 73 Stat. 519, 88 Stat. 395; 29 U.S.C. §§ 151 *et seq.* (1976).

## FACTS

The pertinent facts are derived from the findings of the administrative law judge,[2] which in this respect were adopted by the Board.[3] He found that Branch 6000 represented letter carriers at approximately 110 Post Offices on Long Island. In certain instances, Branch 6000 has conducted separate negotiations with each of these Post Offices leading to local agreements, which cover the letter carriers at the particular Post Office involved. In July 1975, the Postal Service and the National Association of Letter Carriers entered into a national collective-bargaining agreement, which provided that local understandings could be negotiated during October concerning 22 separate matters. One item for local negotiation was whether the letter carriers at the particular Post Office involved would have their two weekly days-off on a fixed or rotating basis.

Branch 6000 sent the shop steward at each of the Post Offices involved a letter containing bargaining instructions and statements of position concerning the 22 items to be negotiated. On the issue of whether days-off would be on a fixed or rotating basis, the union instructed the shop stewards to negotiate for "[w]hatever the membership in your station desire." Branch 6000 and the Post Office at West Islip, New York, negotiated a memorandum of understanding which provided that an annual referendum of union carriers would determine which system for assigning days-off would be employed for the subsequent year.[4]

In December 1975, the shop steward at the West Islip Post Office conducted a referendum among all the letter carriers in the West Islip bargaining unit to determine the days-off question. Several union carriers objected that non-union carriers had been allowed to vote. Union officials instructed the shop steward to set aside the referendum. The steward held a union meeting, from which all non-union carriers were excluded, and conducted a second referendum to determine the days-off policy. The union carriers voted, by a one-vote margin, that all the carriers in the West Islip bargaining unit would have their days-off on a fixed basis rather than on a rotating basis.[5] The West Islip Post Office was advised of this vote, and thereupon instituted a policy of giving all the carriers fixed days-off for the calendar year 1976. This was a change from the previous policy of this Post Office allowing rotating days-off.

A non-union carrier filed a written objection to the outcome of the second referendum. The West Islip Post Master forwarded this objection to the Postal Service division responsible for labor relations. That office instructed the Post Master to proceed with instituting the system of fixed days-off. Then the non-union carrier filed an unfair labor practice charge with the Board.

The administrative law judge concluded that the case involved only an internal union matter, and that no violation of law had been established.[6] The Board disagreed. It found that Branch 6000 had violated section 8(b)(1)(A) of the Act by denying the non-union carriers in the West Islip bargaining unit participation in a referendum conducted to determine a specific term and condition of employment affecting all carriers in

---

2. JA at 10–13.

3. JA at 2.

4. The memorandum of understanding provided: "Carriers shall be allowed to vote each year on having fixed or rotating days off." JA at 10. The ALJ found that the understanding of the parties had been that this provision contemplated participation by union carriers only. JA at 11–12. The Board adopted this interpretation (JA at 2) and it is not challenged on appeal.

5. There were 37 carriers in the bargaining unit of which all but two were members of the union. The vote of union members was 18/17 in favor of fixed days-off. Statement at oral argument of counsel for Branch 6000. The result of the initial referendum, in which all carriers participated, is not a matter of record.

6. JA at 12.

the bargaining unit.[7] The Board cited the *Radio Officers* case [8] and the *Teamsters Local 671* decision,[9] and its decision fairly may be discerned as predicated on the union's breach of its duty of fair representation.

## ANALYSIS

■ With respect to terms and conditions of employment, the Act grants to the majority representative power to act as the exclusive bargaining agent for all the employees in the bargaining unit.[10] Individual employees have no separate negotiating rights; they must look exclusively to the union for protection of their interests.[11] The duty of fair representation imposes upon the bargaining agent an obligation to represent fairly the interests of all employ-

ees in the bargaining unit, in good faith, and without arbitrariness or invidious discrimination.[12] Transgression of this duty is an unfair labor practice cognizable under section 8(b)(1)(A) of the Act.[13]

■ The duty of fair representation requires the bargaining agent to function in a representative capacity, with a fair understanding of the interests of all represented employees. The union has responsibility as exclusive bargaining agent to formulate the employees' position on terms and conditions of employment. This responsibility may be delegated by the union membership. Such delegation is an internal union procedure from which non-union employees properly may be excluded.[14] However, the delegatee, once selected, must in turn function as a representative for all the employees in the

7. JA at 5.

8. *Radio Officers' Union v. N. L. R. B.*, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). The case involved a Board finding of a section 8(b)(1)(A) violation where the union had caused the employer to discriminate against an employee because of his delinquency in paying union dues.

9. *Teamsters Local 671*, 199 N.L.R.B. 994 (1972). The case involved discrimination in representation by a union between member and non-member employees, and the passage specifically cited, *id.* at 999, relates to the particulars in which the offending union failed to give fair and impartial representation to the non-union employees.

10. Section 9(a) of the Act provides in part:
    Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.
    29 U.S.C. § 159(a) (1976).

11. *Emporium Capwell Co. v. Western Addition Community Org'n*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975); *N. L. R. B. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); *Medo Photo Supply Corp. v. N. L. R. B.*, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); *J. I. Case Co. v. N. L. R. B.*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944).

12. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 564, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes*, 386 U.S. 171, 177, 87

S.Ct. 903, 17 L.Ed.2d 842 (1967); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

13. Section 8 of the Act, 29 U.S.C. § 158 (1976), provides in part:
    (b) It shall be an unfair labor practice for a labor organization or its agents—
    (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 of this Act.
    Section 7 of the Act, 29 U.S.C. § 157 (1976), protects, *inter alia*, the right to join or refrain from joining a union. The theory adopted by the Board in this case was that the union's breach of its duty of fair representation improperly encouraged non-union employees to join the union so as to have their interests fairly represented, thus violating section 8(b)(1)(A).
    The Board first recognized a breach of the duty as an unfair labor practice in *Miranda Fuel Co., Inc.*, 140 N.L.R.B. 181 (1962), enf't denied, 326 F.2d 172 (2d Cir. 1963). This interpretation was approved by the Supreme Court in *Vaca v. Sipes*, 386 U.S. 171, 177–78, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (*sub silentio*), and has been given application by the lower courts. *E. g., Teamsters Local 310 v. N. L. R. B.*, 190 U.S.App.D.C. 279 at 284–285, 587 F.2d 1176 at 1181–1182 (1978); *Truck Drivers & Helpers Local 568 v. N. L. R. B.*, 126 U.S.App.D.C. 360, 364–65, 379 F.2d 137, 141–42 (1967).

14. *See Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 217–23, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *N. L. R. B. v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

bargaining unit. If a representative's negotiating decisions are motivated solely by self-interest, then there is a breach of the duty of fair representation.[15] The same result obtains when the decisionmaking function is delegated to a group of employees with the understanding that their actions will be motivated solely by their own personal considerations. In the instant case, a negotiating decision had to be made on whether days-off would be fixed or rotating. The local representative could have reached a decision consistent with the duty of fair representation, so long as there was due consideration of the interests of all employees.[16] However, at this point there was a further delegation of the decision-making function to the union membership.

█ In this case it is not controverted and is indeed the common ground of all concerned—General Counsel, Union, ALJ and Board—that it was contemplated that each union member would vote his personal preference. The union had committed itself to adopt the outcome of the union members' referendum as its selection for the days-off policy to be instituted by the employer. There was to be no further negotiation with the employer, who was indifferent to the choice of a days-off policy. The Board did not exceed its discretion to implement the Act when it concluded that this was an abdication of the representative function that violated the duty of fair representation, and constituted an unfair labor practice under section 8(b)(1)(A). In support of its decision is the consideration that the ultimate decisionmaker—the union membership—did not function in a representative capacity. The referendum merely computed the composite personal preferences of individual union members without consideration of the views or interests of non-union employees.

█ This does not mean that exercise by the union membership of the decisionmaking responsibility would violate the duty of fair representation under all circumstances. Thus, we do not have before us a case of a procedure, with appropriate safeguards, which contemplated that the union membership would act as a "committee of the whole," and that the vote of each member would reflect some consideration of the interests of all employees.

█ The procedure employed in this case is distinguishable from a poll of the union membership to ascertain its views prior to formulation of the negotiating posture for the bargaining unit. In that event, the bargaining responsibility remains with an individual or committee charged with the obligation of fair representation, requiring some consideration of the interests of all employees. That the ultimate decision is concordant with the view expressed by the union membership does not establish a breach of the duty. The general presumption is that the representative obligation has been performed in good faith.

█ Petitioner argues that in these "fair representation" cases, a violation depends on evidence of a disparate impact of the contract terms upon the complainant group, and that no such disparity is present in this case.[17] Clearly, the General Counsel bears the burden of proving that a breach of the duty has occurred. In the usual case

15. *Truck Drivers & Helpers Local 568 v. N. L. R. B.*, 126 U.S.App.D.C. 360, 365–66, 379 F.2d 137, 142–43 (1967) ("union's duty fairly to represent all of the employees for whom it speaks" held violated when its advocacy of one group's interest is supported by no reason other than the "purely political motive of winning an election" by preferring the numerically larger group). *See also Barton Grands, Ltd. v. N. L. R. B.*, 529 F.2d 793 (7th Cir. 1976); *Gainey v. Brotherhood of Railway Steamship Clerks*, 313 F.2d 318, 324 (3d Cir. 1963); *Ferro v. Railway Express Agency*, 296 F.2d 847, 851 (2d Cir. 1961).

16. That the employer in this case had previously acceded to whatever determination was reached by the bargaining representative did not disable the representative from arriving at a decision consistent with the duty of fair representation, nor did it compel a referendum of all employees in the bargaining unit as the method of decisionmaking.

17. Pet.Br. at 20, 37.

this burden may be impossible to meet absent some evidence of disparate impact. In this case, however, violation of the duty is apparent from the unique circumstances. Given the understanding that each union member would vote his personal preferences, evidence of disparate impact is unnecessary to prove that the interests of non-members have been ignored.[18]

■ We are in no position to reject as untenable the Board's statement that the Branch 6000 procedure is distinguishable from a procedure of contract ratification restricted to union members.[19] A union ratification procedure is consistent with negotiation of a tentative contract by the bargaining agent, acting in a representative capacity, and with observance of the duty of fair representation. At least where, as Judge McGowan put it, there is a "rational argument" for rejection of the unsuccessful view,[20] the bargaining representative is not required to carry out the wishes of non-union employees; it suffices that he is available to ascertain them and take them into account.

In the real world of ratification, especially if the vote concerns only a single term and condition of employment, there is the possibility that the interests of non-union employees might be ignored. This concern would be heightened where the initial vote of the membership goes against ratification and the bargaining agent effects a modification consonant with the views of union members. It may be that such cases will come to turn on their facts, but it suffices in this case to say that the result reached here does not predetermine the results in ratification cases.

■ The Board's conclusion in this case is fortified by the consideration that there was neither a procedure, nor the intent, to consider the views and interests of non-union employees. In most cases a general familiarity with the working environment may allow a representative of some experience to appreciate adequately the perspective of all employees. There must be communication access for employees with a divergent view, although there is no requirement of formal procedures.[21] Where, as here, it appears to the Board that as a practical matter one segment of the bargaining unit has been excluded from consideration, it may find a breach of the duty of fair representation.[22]

Although the petitioner has challenged the validity of the Board's unfair labor practice determination, it has not questioned the appropriateness of the remedy.[23]

*Affirmed.*

18. Compare *Oetiker v. Jurid Werke, G. m. b. H.,* 181 U.S.App.D.C. 124, 128–32, 556 F.2d 1, 5–9 (1977).

19. JA at 4 n. 1.

20. *Truck Drivers & Helpers Local 568 v. N. L. R. B.,* 126 U.S.App.D.C. 360, 365, 379 F.2d 137, 142 (1967).

21. *Waiters Union Local 781 v. Hotel Ass'n,* 162 U.S.App.D.C. 265, 267, 498 F.2d 998, 1000 (1974).

22. *N. L. R. B. v. Local No. 106, Glass Bottle Blowers Ass'n,* 520 F.2d 693 (6th Cir. 1975); see *Retana v. Apt., Motel, Hotel & El. Op. Union, Local No. 14,* 453 F.2d 1018, 1023–25 (9th Cir. 1972).

23. The Board's order required Branch 6000 in part to:

    1. Cease and desist from denying nonunion unit employees the right to vote in a referendum conducted to determine specific terms and conditions of employment affecting all employees in the West Islip, New York, bargaining unit represented by Respondent.

    2. Take the following affirmative action designed to effectuate the policies of the Act:

      (a) Set aside, cancel, and invalidate the results of the most recent annual election conducted pursuant to the October 1975 Local Memorandum of Understanding among union members of the bargaining unit to determine whether the days off of the bargaining unit carriers shall be "fixed" days off or "rotating" days off, and, within 30 days of the date of this Decision and Order, conduct another election among all of the carriers in the bargaining unit to determine whether the days off of the bargaining unit carriers shall be "fixed" days off or "rotating" days off.

JA at 5–6. The Board also required adequate posting by the union of a notice drafted by the Board designed to advise employees of the resolution of the case. JA at 6, 8. In addition, provision was made for posting of the notice by the employer, JA at 6, and notification to the

NLRB of steps taken in compliance with the order, JA at 7.

The provision for a referendum appears in the memorandum of understanding between the union and the local Post Office, which relat-ed to a referendum decision without negotia-tion. We do not understand the Board's deci-sion to hold that in the future the issue of days-off policy must be determined by an open referendum.