Charles P. CAUDLE, et al., Plaintiffs,

v.

PAN AMERICAN WORLD AIRWAYS,
INC., et al., Defendants.

Civ. A. No. 84–2059.

United States District Court,
District of Columbia.

Nov. 23, 1987.

Richard F. Watt, Robert H. Nichols, Cotton, Watt, Jones & King, Chicago, Ill., Denis F. Gordon, David M. Ermer, Gordon & Barnett, Washington, D.C., for plaintiffs.

Joseph L. Manson, III, Ronald B. Natalie, James F. Hibey, Verner, Liipfert, Bernhard & McPherson, Washington, D.C., for defendants.

Jonathan A. Cohen, Air Line Pilots Assoc., Washington, D.C., for defendant Air Line Pilots Association.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This case presents vivid proof that horizontal mergers can, on occasion, produce severe diseconomies in operation and management. The 1981 merger of Pan American World Airways (Pan Am) and National Airlines (National) forms the backdrop for the present controversy. Plaintiffs are 37 Pan Am pilots who flew for National prior to the merger of the two companies.[1] They allege that defendant Air Line Pilots Association (ALPA) violated its duty of fair representation, and that defendant Pan Am violated its contractual obligations, by resolving several grievance disputes in a manner that favored pre-merger Pan Am pilots to the detriment of pre-merger National pilots. Presently pending are defendants' motions for summary judgment and plaintiffs' opposition thereto. For the reasons outlined below, defendants' motions will be granted.

### I. Background

At the time of their merger in 1981, Pan Am and National flew different types of aircraft (B-727s and L-1011s for Pan Am, DC-10-10s and DC-10-30s for National), offered separate flying routes, and maintained distinct pilot and flight engineer seniority lists. In order to assure the equitable integration of the seniority lists (which in turn determine the availability of the most desirable flying routes), the pilots and engineers turned to Arbitrator Lewis M. Gill, whose March 12, 1981, Award (the Gill Award) comprehensively integrated the pre-merger seniority lists.[2] The heart of the Gill Award, Section IV, established a complex system of formulas to allocate pilot and engineer positions under normal conditions and in the event of a furlough or reduction in the number of Pan Am aircraft.

In December 1982, such a reduction in air fleet took place when Pan Am issued a proffer, or notice, to its airmen indicating that the company was removing its fleet of 12 L-1011 airplanes from service because continued flying of these aircraft was no longer economical. In February 1983, however, Pan Am changed course and issued a new proffer that returned nine of the L-1011s to service but provided that the planes were to be "lightly crewed." Consistent with its new proffer, Pan Am sent a letter on March 3, 1983, to the airmen who were adversely affected by the changes in the L-1011 fleet. Although some of these airmen, who flew with Pan Am prior to the merger, were able to "cross-over" and assume slots on DC-10-10 planes pursuant to Section IV(H) of the Gill Award, many were dissatisfied with the new positions announced in the March 3 letter. Two proceedings were initiated. First, the former Pan Am L-1011 pilots pursued, and ultimately lost, an arbitration proceeding in which they sought additional cross-over po-

---

1. By Order dated September 23, 1987, the original plaintiffs—Caudle, Wynne, Mackey and Pawley—were granted leave to amend their complaint to add 33 new plaintiffs to this action.

2. *See* Exhibit A to Amended Complaint. Although not a party to the arbitration proceeding, Pan Am later accepted and implemented the Gill Award, which became part of its collective bargaining agreement with ALPA.

sitions on DC–10–10 planes. Second, on June 2, 1983, ALPA's Pan Am Master Executive Council (ALPA–MEC), the ALPA organization selected by Pan Am pilots to represent them in negotiations with the airline, filed Grievance 82–83 to protest the award of certain positions at Pan Am's Miami and New York bases.[3]

Several other events took place in the summer and fall of 1983 that further complicated the relationship between Pan Am and the Union. In June 1983, Pan Am decided to reactivate the three grounded L–1011s but refused ALPA's request that it issue a new proffer reflecting the change. Asserting that Pan Am's refusal violated the collective bargaining agreement, ALPA–MEC filed another Grievance, 116–83, on June 20, 1983. In early September, Pan Am prepared, but later retracted, a proffer that would have recognized the June reactivation of the three L–1011s. Because the company now had 12 fully operational L–1011 aircraft but lacked the necessary crew complement, Pan Am issued a letter on September 22 to 35 former Pan Am airmen cancelling their excess notices of March 3, 1983, and the positions established by the February proffer; these individuals were therefore returned to their original L–1011 positions. And, on October 14, 1983, Pan Am sold to American Airlines all of its DC–10–10s and four of its five DC–10–30s—planes that had belonged to National before the merger. The company issued a proffer in November 1983 reflecting these events. Thereafter, ALPA filed Grievance 233–83, which challenged Pan Am's September 22, 1983 letter reinstating the former L–1011 pilots to their original routes. Arbitrator George Nicolau sustained ALPA's position on December 21, 1983, finding that the September 22, 1983, letter violated the collective bargaining agreement, and ordered Pan Am to rescind the letter it had issued to the former Pan Am pilots.[4] Nicolau withheld awarding ultimate relief of repositioning pilots, how-

ever, because of the pendency of Grievances 82–83 and 83–116, the resolution of which could also impact other flight routes. Amended Complaint, Exh. F at 11–12.

Pan Am then sought to settle these two outstanding grievances with ALPA. Discussions took place over the next several weeks, culminating in the January 12, 1984 settlement agreement that is the focus of this litigation. The former National pilots, alleging that the settlement agreement failed to adequately protect their interests, filed internal union charges against Captain James MacQuarrie, chairman of ALPA–MEC, claiming that he violated the ALPA Constitution and Bylaws in conducting his negotiations with Pan Am. Those charges were ultimately rejected by the ALPA Appeals Board on August 9, 1984.

## II. *The Instant Lawsuit*

In this action plaintiffs assert that ALPA breached its duty of fair representation to the former National pilots in its conduct of negotiations leading up to, and including, the signing of the settlement agreement. Specifically, they allege that the settlement agreement upset their entitlements under the Gill Award to a number of L–1011 positions and caused a "ripple effect" that denied promotion possibilities to a number of former National pilots. In addition, plaintiffs contend that, by entering into the settlement agreement, Pan Am breached its contractual duties under the Gill Award and collective bargaining agreement and aided and abetted ALPA in its breach of its duty of fair representation. Plaintiffs seek a declaration that the settlement agreement is unlawful, an injunction prohibiting defendants from carrying out the settlement agreement and reinstating the December 21, 1983, Nicolau Award, and damages for monetary losses resulting from the allegedly improper assignment of pilot positions.[5]

---

**3.** ALPA–MEC filed its grievance with a five-member System Board of Adjustment established in the collective bargaining agreement.

**4.** Pan Am had previously rescinded the September 22, 1983, letter with respect to flight engi-

neers, who had lodged a written protest with the company rather than resort to arbitration.

**5.** On February 27, 1987, plaintiffs' motion to certify a class consisting of all former National pilots now flying for Pan Am was denied. On

Defendants have moved for summary judgment and raise three main arguments. First, both ALPA and Pan Am contend that ALPA did not favor pre-merger Pan Am pilots at the expense of former National pilots and therefore did not breach its duty of fair representation to plaintiffs. Further, Pan Am argues that, even if ALPA did breach its duty, Pan Am cannot be held liable because no collusion existed between it and ALPA during the course of the negotiations leading up to the settlement agreement. Finally, Pan Am urges that this Court does not have subject matter jurisdiction under the Railway Labor Act to consider plaintiffs' claim that Pan Am violated contractual duties imposed by the Gill Award and the collective bargaining agreement.[6] Before turning to a consideration of these claims, it is appropriate to set forth the legal principles governing this matter.

## III. *Applicable Law*

### A. *The Duty of Fair Representation*

Plaintiffs bring this suit under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, against ALPA, their exclusive bargaining representative, and Pan Am, their employer.[7] In *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), the Supreme Court first acknowledged that, because the Act empowered unions to act as exclusive agents for all the employees in a given bargaining unit, a correlative duty existed "to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them." *Id.* at 203, 65 S.Ct. at 232. Since that time, the Court has stressed that the bargaining agent "is responsible to, and owes complete loyalty to, the interests of all whom it represents," *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), and its duty extends to "the negotiation, administration, and enforcement of collective-bargaining agreements." *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979). *See also Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (duty extends beyond making of collective bargaining agreement to adjustment of rights and resolution of disputes under the contract).

The touchstone of the union's duty to its members is fundamental fairness. Thus, the duty requires the bargaining agent "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). Because, however, the very nature of collective bargaining requires an agent to balance interests that quite often are contradictory, *see, e.g., Humphrey v. Moore*, 375 U.S. 335, 349–50, 84 S.Ct. 363, 371–72, 11 L.Ed.2d 370 (1964), it is clear that "a wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents." *Huffman*, 345 U.S. at 338, 73 S.Ct. at 686. The Court elaborated:

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The com-

September 23, 1987, however, plaintiffs were granted leave to amend their complaint to add as new plaintiffs 33 former National pilots who actually suffered monetary harm as a result of the settlement agreement. *See* footnote 1, *supra.* In addition, the motion of Pan Am's Master Executive Council to intervene in this lawsuit was denied; the court of appeals affirmed that judgment on March 4, 1986.

**6.** ALPA also argues that the original plaintiffs lack standing to pursue this action because they have now received the position entitlements allegedly denied to them in the settlement agreement. Motion for Summary Judgment at 35–36. In light of the September 23, 1987, Order, that objection—whatever its original merit—is now moot.

**7.** The provisions of the Railway Labor Act govern labor disputes involving the airline industry. *See* 45 U.S.C. § 181.

plete satisfaction of all who are represented is hardly to be expected. *Id.*[8]

 Thus, a union may distinguish between employees on the basis of seniority, the type of work performed, or the skills needed for a particular position without violating the duty of fair representation. *Steele,* 323 U.S. at 203, 65 S.Ct. at 232. A union may not, however, take action on the basis of factors such as the political strength of one faction of employees, *Branch 6000 v. NLRB,* 595 F.2d 808, 812 n. 15 (D.C.Cir.1979), racial considerations, *Conley,* 355 U.S. at 46, 78 S.Ct. at 102, or personal self-interest, preference, or animosity. *NLRB v. American Postal Workers Union,* 618 F.2d 1249, 1255 (8th Cir. 1980). In short, so long as the bargaining agent does not act on the basis of arbitrary factors—such as race, personal animosity or sheer numbers of employees in a given group—it will not breach the duty of fair representation.

### B. *Summary Judgment*

This Court may grant defendants' motions for summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c). In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986), the Supreme Court delineated two inquiries that a district court must make before granting summary judgment. First, the movant must show that there is no disagreement as to a *material* fact, which the Court described as one "that might affect the outcome of the suit under the governing law." In addition, summary

judgment is appropriate only if the dispute is not *genuine.* In this regard, the trial judge should not "weigh the evidence and determine the truth of the matter" but rather perform "the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* 106 S.Ct. at 2511. Finally, the Court pointed out that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 2513.

 The nature of a duty of fair representation suit necessarily complicates this inquiry. A court must be particularly wary of granting summary judgment in fair representation cases, which often probe the intent and state of mind of the bargaining agent to determine whether its actions were discriminatory, arbitrary or in bad faith. If, however, plaintiffs cannot offer any "concrete evidence" (*Anderson,* 106 S.Ct. at 2514), but instead simply rely on conclusory allegations with respect to the defendants' state of mind, summary judgment would clearly be appropriate. *See Price v. International Union,* 795 F.2d 1128, 1135–36 (2d Cir.1986) (affirming grant of summary judgment in duty of fair representation case); *Brown v. Trans World Airlines,* 746 F.2d 1354, 1358–60 (8th Cir.1984).

### IV. *Discussion*

#### A. *Breach of Duty of Fair Representation by ALPA*

At the core of plaintiffs' amended complaint is their contention that ALPA

---

**8.** Pan Am argues that a less exacting standard of review governs a union's activities in the negotiation context than in its administration of the collective bargaining agreement. Memorandum at 23–26. The cases from this Circuit considering the duty of fair representation in the negotiation context, however, fail to articulate such a distinction. *See, e.g., American Postal Workers Union v. American Postal Workers,* 665 F.2d 1096, 1105 (D.C.Cir.1981); *Warehouse Union, Local 860 v. NLRB,* 652 F.2d 1022, 1023–24 (D.C.Cir.1981).

Moreover, ALPA's citation to *Baker v. Newspaper & Graphic Communications Union,* 628 F.2d

156, 162 (D.C.Cir.1980) ("[a]bsent the most compelling circumstances the courts will not review the results of collective bargaining to determine whether a bargaining team should have accepted or rejected particular proposals") is inapposite. *See* Memorandum at 27. The quoted language dealt with the issue of *Garmon* preemption under the National Labor Relations Act, *id.* at 160–63. In its discussion of the duty of fair representation, the court made no mention of the breadth of discretion accorded to unions. *See* 628 F.2d at 164–67.

breached its duty of fair representation because the union favored former Pan Am pilots over former National pilots in the events leading up to, at the time of, and subsequent to, the January 12, 1984 settlement agreement. They claim that ALPA discriminated against former National pilots because the union is dominated, in numerical and thus political terms, by former Pan Am pilots.[9] Let us consider the specific incidents that gave rise to this litigation.

### 1. Resolution of Grievances 82–83, 116–83 and 233–83

■ Plaintiffs allege that ALPA's handling of these grievances displayed a persistent bias by the Union in favor of pre-merger Pan Am pilots. First, they contend that ALPA permitted Grievances 82–83 and 116–83 to lay dormant throughout the summer and fall of 1983 and only "revived" its efforts to resolve these issues after the December 21, 1983, Nicolau Award was decided in favor of pre-merger National pilots. Aside from the conclusory statements of plaintiffs Caudle (Dep. at 36) and Wynne (Dep. at 46) that no action was taken, however, the evidence presented overwhelmingly demonstrates that ALPA actively pursued those grievances. J.B. MacQuarrie, Chairman of ALPA–MEC, constantly encouraged Pan Am officials to issue a new proffer after the company had returned its 12 L–1011s to full service. Cutrone Dep. at 67–68; Carragher Dep. at 152–54.[10] Moreover, MacQuarrie was not informed by Captain Henry Papa, ALPA's grievance chairman, of any delays in processing these grievances (which were only two out of approximately 200 grievances pending at the time), MacQuarrie Dep. at 110–13. Even assuming, arguendo, that

no action was taken on these grievances, plaintiffs fail to adduce any evidence to support their theory that this delay was intentionally undertaken to frustrate the interests of former National pilots.

Plaintiffs further assert that ALPA failed to act aggressively after Pan Am issued its September 22, 1983, letter (returning 35 former Pan Am pilots to positions they held prior to the February 1983 proffer) because inaction would favor former Pan Am pilots. MacQuarrie protested this action to Pan Am officials (Carragher Dep. at 133), however, and requested that Papa file a grievance on the matter. MacQuarrie Dep. 98, 101. Upon being informed in December 1983 that Papa had not filed a grievance over the September 22 letter, MacQuarrie promptly ordered that ALPA–MEC file a grievance (which later became Grievance 233–83, the subject of the Nicolau Award). Id. at 114–15. Plaintiffs do not directly dispute this evidence; instead, they suggest a series of events that they claim should have alerted MacQuarrie to the fact that no grievance had been filed. See Plaintiffs' Statement of Genuine Issues of Material Fact, Section II. A ¶ 4. Having examined these incidents, this Court cannot infer, merely from plaintiffs' recitation that MacQuarrie failed to realize that a greivance was not being processed, that MacQuarrie intentionally blinded himself and knowingly ignored legitimate concerns of the former National pilots. Without any "concrete evidence" (Anderson, 106 S.Ct. at 2514) from plaintiffs that ALPA deliberately refused to file a grievance, the Court cannot find that ALPA acted in bad faith or discriminated against former National pilots with respect to its handling of Grievance 233–83.[11]

---

9. Plaintiffs point out that at the time of the Gill Award, there were approximately twice as many Pan Am pilots as National pilots, that ALPA–MEC was dominated by former Pan Am pilots, and that the Chairman of ALPA–MEC, Captain J.B. MacQuarrie, was a former Pan Am pilot. Memorandum at 3–4.

10. The very subject of Grievance 116–83 was Pan Am's failure to issue a new proffer after returning the L–1011s to service.

11. Plaintiffs also contend that ALPA allowed expedited consideration of Grievance 233–83, ahead of Grievances 116–83 and 82–83, because of "political considerations" inherent in the Pan Am/National dispute. Memorandum in Opposition at 13. This contention, however, flies in the face of plaintiff Caudle's own testimony, which clearly reveals that he, not ALPA, sought immediate consideration of Grievance 233–83. Caudle Dep. at 32.

Finally, plaintiffs attack ALPA's decision to settle, rather than arbitrate, the issues presented in Grievances 82–83 and 116–83 after the Nicolau Award on December 21, 1983. Defendants assert that Pan Am decided to settle these grievances, rather than risk another loss through arbitration, in order to bring certainty to its flight operations for the following year. *See Pan Am's Memorandum in Support of Summary Judgment at 13–14 & n. 11.* Plaintiffs do not dispute Pan Am's concern in this regard; they contend, however, that ALPA "overstates" the possibility that the airline would have to shut down its operations if those grievances were decided adversely to it and they also assert that some of the pressure to settle originated with ALPA's Captain MacQuarrie. Memorandum in Opposition at 15–16. Even accepting the truth of these allegations, however, the Court fails to discern any discriminatory motive at work. The Nicolau Award expressly declined to order make-whole relief precisely because of "two grievances [116–83 and 82–83] presently pending before the Board." Amended Complaint, Exh. F at 3. Even if overstated, Pan Am's concern with bringing the proffer issue to a conclusion, and ALPA's concurrence in that regard, appears eminently reasonable given the disposition of the Nicolau Award.

In short, although it cannot be said that ALPA's handling of the three grievances arising out of the February 1983 proffer was perfectly conducted in all respects, its actions are understandable in light of the internecine warfare being waged between the Pan Am and National pilots. Moreover, plaintiffs have simply failed to adduce any tangible evidence to suggest that ALPA intentionally manipulated these grievances to suit the whims of pre-merger Pan Am pilots. Plaintiffs' theories, while elaborate and interesting, are not supported by any evidence that would permit the inference of discrimination, arbitrary action, or bad faith.

### 2. *The Settlement Negotiations*

■ Plaintiffs also attack the negotiations leading to the signing of the settlement agreement on January 12, 1984. They claim that MacQuarrie entered the discussions on Grievances 116–83 and 82–83 knowing that sensitive Gill Award issues were at stake, that former National pilots were improperly excluded from the settlement discussions, and that MacQuarrie and Pan Am officials rejected the former National pilots' proposals only after learning of opposition from former Pan Am pilots. A thorough review of the evidence presented, however, fails to disclose that ALPA representatives sought to discriminate against National airmen. To the contrary, the evidence adduced points to a constant attempt by ALPA to consult with the former National pilots, obtain their views, and integrate their proposals with those of the former Pan Am pilots and with the positions taken by Pan Am officials.

The first settlement meeting took place in Miami on December 28, 1983.[12] Plaintiffs Caudle and Wynne attended the meeting as representatives of the former National pilots with respect to Gill Award issues. Also present were MacQuarrie, a number of Pan Am officials, and representatives of former Pan Am pilots.[13] A tentative agreement was forged rather quickly on the major focus of the dispute: Pan Am would issue a "paper proffer" that would reinstate some former Pan Am pilots to positions on L–1011s and National pilots who were otherwise entitled to these positions would receive pay protection from Pan Am.[14] The real issue, however, con-

---

**12.** Before the meeting occurred, plaintiff Caudle indicated that he would attend only if Pan Am intended to satisfy *his* demands. Caudle Dep. at 41, 45.

**13.** The undisputed evidence shows that Gill representatives were invited to the meeting because Pan Am officials realized that settlement of Grievances 116–83 and 82–83 would present sensitive "entitlement" issues covered by the Gill Award. Carragher Dep. at 172; MacQuarrie Dep. at 127; Plaintiffs' Memorandum in Opposition at 44 ("blue-orange" issues were involved at December 28 meeting).

**14.** The distribution of pilots would essentially track the September 1983 proffer that was presented to the ALPA but eventually withdrawn.

cerned the extent of pay protection. Caudle insisted that, because Pan Am pilots would retain their L–1011 positions and National pilots would receive compensation for not obtaining those seats, less senior National pilots were being denied positions that would have become available if the National pilots had been awarded the L–1011 positions. Caudle demanded pay protection for pilots hurt by this "ripple effect." Captain Labbee, representing the former Pan Am pilots, and Pan Am officials steadfastly opposed compensating the National pilots for the ripple effect.

Faced with this impasse, Captain MacQuarrie did not display bias against the position asserted by the National pilots; rather, he attempted to reconcile the conflicting views. When Labbee and Caudle engaged in a heated exchange over pay protection for the ripple effect, MacQuarrie requested that Pan Am officials leave the room and attempted to mediate the squabble between the Pan Am and National pilots. Carragher Dep. at 219–220.[15] Moreover, when Caudle and Wynne later left the meeting after Pan Am officials refused to negotiate over the ripple effect, MacQuarrie asked company officials to continue to discuss Grievances 116–83 and 82–83, but no agreement was reached.[16] Had ALPA and MacQuarrie harbored the bias against former National pilots that plaintiffs suggest, the departure of Caudle and Wynne would surely have provided a perfect opportunity to strike an agreement in favor of Pan Am pilots. In short, Captain MacQuarrie's actions during the December 28 meeting do not disclose any discrimination against National pilots but a conscious attempt to mediate what all agree was a hostile dispute.[17]

The next meeting took place in New York on January 5, 1984, between attorneys for the parties involved.[18] Robert Nichols, representing the National pilots, reiterated their demand of pay protection for the ripple effect and outlined a mediation and arbitration proceeding to resolve the National pilots' concerns. The representatives of Pan Am and the Pan Am pilots rejected these suggestions (seeking instead to revive the tentative proposal discussed at the December 28 meeting) and the meeting dissolved without agreement.

Plaintiffs make much of the presence of John McGuinn at the January 5, 1984, meeting. McGuinn, who had served as outside counsel to ALPA for several years, came to the meeting as a representative for the former Pan Am pilots. When, however, Nichols threatened that a duty of fair representation suit was possible, MacQuarrie asked McGuinn if the agreement under discussion treated the former National pilots fairly and equitably. McGuinn, by his own admission, rendered his opinion that the agreement would not breach ALPA's duty. McGuinn Dep. at 60–61. Aside from their assertion that McGuinn was wearing two hats at the meeting—a fact not in dispute—plaintiffs have not specifically delineated how McGuinn's presence affected MacQuarrie's and ALPA's duty to represent them fairly. McGuinn testified that MacQuarrie was seeking his guidance as to whether the agreement was fair to the former *National* pilots, and plaintiffs have not offered any evidence to rebut that statement. There was nothing arbitrary or

---

**15.** Throughout the meeting, MacQuarrie did not express a view on the propriety of pay for the ripple effect. Carragher Dep. at 219; Wynne Dep. at 53.

**16.** In fact, approximately one hour after the meeting broke up, Captain MacQuarrie approached Donald Carragher, who had stated at the end of the meeting that Pan Am would not provide *any* pay protection for National pilots because of threats by Caudle to sue Pan Am over this issue. MacQuarrie berated Carragher for his remark and threatened to break off talks himself if Pan Am continued to adopt such a position. Carragher Dep. at 225–226.

**17.** Significantly, two National pilots present at the meeting did not find anything improper about MacQuarrie's actions. Wynne Dep. at 54, 58; Burke Dep. at 33–35.

**18.** The talks resumed, at least in part, because the former National pilots were willing to modify the strict demands they sought at the December 28 meeting, a view conveyed by Caudle to Pan Am's Carragher by telephone on New Year's Eve. Caudle Dep. at 57; Carragher Dep. at 251–252.

discriminatory about MacQuarrie's decision to seek McGuinn's advice.

Finally, the record relating to the events between the January 5, 1984, meeting and the signing of the settlement agreement on January 12, 1984, does not reveal any breach of duty by ALPA. Plaintiffs claim that MacQuarrie "consciously excluded" National pilot representatives from these discussions. It is undisputed, however, that Caudle and Wynne were kept informed of the progress of the negotiations by Carragher during this time, that Richard Burke—a former National pilot—was present throughout the negotiations, and that Caudle received a copy of the final agreement before it was signed. Of even greater significance, however, is the fact that Pan Am had realized that it would not be able to reach an agreement that would satisfy both the Pan Am and National pilots and decided to deal only with ALPA–MEC.[19] Thus, former *Pan Am* pilots were also excluded from these negotiating sessions. Carragher Dep. at 294–296. It was, in short, the non-negotiability stance adopted by the National representatives, not a persistent discriminatory purpose, that led to their exclusion from the ongoing settlement talks.

### 3. *The Settlement Agreement*

At the heart of plaintiffs' lawsuit is their claim that the January 12, 1984, settlement agreement discriminates against them and in favor of pre-merger Pan Am pilots. A close examination of the terms of the agreement leads to the conclusion that, although the National pilots did not receive all that they were seeking, neither were they arbitrarily discriminated against.

▇▇▇ Plaintiffs first attack the actual terms of the settlement agreement. They contend that the agreement denied former National pilots positions on L–1011s and failed to provide pay protection to less junior National pilots for the "ripple effect." It is undisputed, however, that former Na-

tional pilots also were disadvantaged to some extent under the agreement. Although the agreement restored pre-merger Pan Am pilots to their former positions on L–1011s, only *some* Pan Am pilots were so restored and the agreement provided *no* pay protection for any of the Pan Am pilots who did not return to L–1011 service. Lastly, the agreement did award pay protection to National pilots with respect to Grievance 82–83, which dealt with the Miami/New York assignment problem. The Court does not find in these terms a one-sided arrangement aimed at ruining former National pilots. Rather, the agreement represents a classic compromise: the Pan Am and National pilots each got something of what they sought and each did not receive something that was expected. The duty of fair representation does not require, however, that a bargaining agent completely satisfy every demand presented by its conflicting constituencies but only proscribes conduct or results that are arbitrary, discriminatory, or taken in bad faith. *See Huffman,* 345 U.S. at 338, 73 S.Ct. at 686. The terms of the January 12, 1984, settlement agreement—which, of course, are a matter of record and not in dispute—do not provide any evidence of bias against former National pilots in favor of former Pan Am pilots.

Plaintiffs also raise two other arguments with respect to the settlement agreement. They claim (Memorandum at 23) that the January 12, 1984, agreement was discriminatory because it was less favorable than a proposal advanced at the December 28, 1983, meeting in Miami. Be that as it may, those same proposals were rejected by plaintiff Caudle at the December 28 meeting because they were inconsistent with his non-negotiable demands. Carragher Dep. at 215–216. Having had the opportunity to accept those proposals, plaintiffs cannot now claim that the settlement agreement dealt with their needs in an arbitrary fashion because it did not include elements that

---

**19.** This realization was, in hindsight, quite prophetic: ALPA and Pan Am have also been sued in a duty of fair representation suit by former Pan Am pilots who are dissatisfied with the

terms of the January 12, 1984, settlement agreement. *Foxworth v. Pan American,* No. 85–CIV–0343 (S.D.N.Y.).

they had earlier rejected.[20] Finally, plaintiffs claim that ALPA's implementation of the agreement and its actions before the ALPA Hearing Board demonstrate ALPA's discriminatory intent. Memorandum at 24–27. Plaintiffs' argument that ALPA acquiesced in Pan Am's alleged improper implementation directly contravenes the position asserted by Council 8 (which is mainly composed of former National pilots) in a grievance filed over this matter. *See* Plaintiffs' Exh. 28 at 22. And the actions of Gary Green, ALPA's counsel, before the ALPA Hearing Board do not rise to a level of discrimination against former National pilots. Green's unrebutted testimony demonstrates his concern over "imminent" litigation that was threatened by Caudle. Green Dep. at 29. Given the charges and countercharges existing at the time, there was nothing arbitrary in the actions of an attorney seeking to protect his client's interests at that point in time.

The record does not support the conclusion that ALPA breached its duty of fair representation to plaintiffs. To the contrary. Although plaintiffs have posed some interesting theories in support of their complaint, their allegations have not progressed to the kind of "concrete" and "affirmative" evidence needed to defeat a motion for summary judgment. *Anderson*, 106 S.Ct. at 2514. Defendants' motions shall be granted with respect to ALPA's duty of fair representation.

### B. *Breach of Duty and Collusion by Pan American*

▇ Plaintiffs' complaint also alleged that defendant Pan Am aided and abetted ALPA's breach of its duty of fair representation owed to plaintiffs. Where, as here, a duty of fair representation claim brought against a union and its employer is rejected as to the union, the claim against the employer must also be dismissed. *See United Independent Flight Officers v. United*

*Airlines*, 756 F.2d 1274, 1283 (7th Cir. 1985). Accordingly, plaintiffs' claim against Pan Am will also be dismissed.[21]

### C. *Subject Matter Jurisdiction Over Breach of Contract Claim*

▇ Pan Am also moves for summary judgment with respect to plaintiffs' allegations that it violated the collective bargaining agreement, as well as the Gill and Nicolau Awards, by entering into the settlement agreement. Pan Am contends that the Railway Labor Act does not authorize a direct action by employees against their employer and asserts that plaintiffs must instead pursue their claims before the System Board of Adjustment pursuant to 45 U.S.C. § 184. *See Crusos v. United Transportation Union*, 786 F.2d 970, 972 (9th Cir.), *cert. denied*, ── U.S. ──, 107 S.Ct. 409, 93 L.Ed.2d 361 (1986). In response, citing *Vaca v. Sipes*, plaintiffs claim that resort to the Board would be futile and therefore exhaustion of administrative remedies should not be required in this instance.

Plaintiffs' argument must be rejected. First, plaintiffs misconstrue the thrust of Pan Am's argument. Pan Am does not claim that exhaustion is a prerequisite to invoking this Court's jurisdiction; rather, Pan Am claims that the Railway Labor Act vests exclusive and final jurisdiction over contract matters with the Board. Second, plaintiffs' assertion that ALPA and Pan Am somehow "control" the Board, simply ignores the Nicolau Award ruling on Grievance 233–83, rendered on December 21, 1983, that *favored* premerger National pilots. Finally, *Vaca* involved a union's refusal to pursue grievance procedures on behalf of one of its members, *see* 386 U.S. at 185–86, 87 S.Ct. at 914–15, and is therefore inapposite in this context. Summary judgment will therefore be entered for Pan

**20.** Plaintiffs have also failed to rebut Carragher's testimony that the former National pilots were *benefitted* by the settlement of Grievance 116–83. Carragher Dep. at 182–183. Carragher noted that, if ALPA won that grievance at an arbitration proceeding, Pan Am would be forced to reproffer its routes in favor of former Pan Am pilots, thus preventing *any* pay protection for former National pilots.

**21.** Plaintiffs' opposition does not seriously contest this issue. *See* Memorandum at 49–55.

**324**

Am with respect to plaintiffs' breach of contract allegations.

### D. *Conclusion*

A union's duty to fairly represent the individuals in its bargaining unit is a difficult task under the best of circumstances. Complicating ALPA's duty in this case was the continuing tension resulting from the merger of Pan Am and National. The January 12, 1984, settlement agreement was neither a model of perfection, nor was the process leading up to the agreement entirely without flaw. Nonetheless, the duty of fair representation does not impose a requirement of perfection or flawlessness; rather, the duty is breached only when a union's conduct is "arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916. Because the record does not reflect either discriminatory intent or bad faith, ALPA is entitled to summary judgment against the plaintiff. A separate Judgment accompanies this Memorandum Opinion.

Accordingly, it is

ORDERED that defendants' motions for summary judgment be and they hereby are granted; and it is

FURTHER ORDERED that judgment will be entered on behalf of defendants and against plaintiffs in this action.